ARKANSAS ELECTRIC COOPERATIVE CORP. *v.*
ARKANSAS PUBLIC SERVICE COMMISSION

No. 81–731.   Argued January 17, 1983—Decided May 16, 1983

376

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 396.

*Robert D. Cabe* argued the cause for appellant. With him on the brief was *Leland F. Leatherman.*

*Jeff Broadwater* argued the cause for appellee. With him on the brief was *Robert H. Wood, Jr.**

---

*\*Wallace F. Tillman* filed a brief for the National Rural Electric Cooperative Association as *amicus curiae* urging reversal.

*Paul Rodgers* filed a brief for the National Association of Regulatory Utility Commissioners as *amicus curiae* urging affirmance.

JUSTICE BRENNAN delivered the opinion of the Court.

This appeal requires us to decide whether the Arkansas Public Service Commission (PSC) acted contrary to the Commerce Clause or the Supremacy Clause of the Constitution when it asserted regulatory jurisdiction over the wholesale rates charged by the Arkansas Electric Cooperative Corporation (AECC) to its member retail distributors, all of whom are located within the State. The Arkansas Supreme Court upheld the PSC's assertion of jurisdiction. We affirm.

## I

Maintaining the proper balance between federal and state authority in the regulation of electric and other energy utilities has long been a serious challenge to both judicial and congressional wisdom. On the one hand, the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States. See *Munn* v. *Illinois*, 94 U. S. 113 (1877). On the other hand, the production and transmission of energy is an activity particularly likely to affect more than one State, and its effect on interstate commerce is often significant enough that uncontrolled regulation by the States can patently interfere with broader national interests. See *FERC* v. *Mississippi*, 456 U. S. 742, 755–757 (1982); *New England Power Co.* v. *New Hampshire*, 455 U. S. 331, 339 (1982).

This dilemma came into sharp focus for this Court early in this century in a series of cases construing the restrictions imposed by the Commerce Clause on state regulation of the sale of natural gas. Our solution was to fashion a bright line dividing permissible from impermissible state regulation. See *Missouri* v. *Kansas Gas Co.*, 265 U. S. 298, 309 (1924); *Public Utilities Comm'n for Kan.* v. *Landon*, 249 U. S. 236 (1919); cf. *Pennsylvania Gas Co.* v. *Public Service Comm'n of N. Y.*, 252 U. S. 23 (1920). Simply put, the doctrine of these cases was that the retail sale of gas was subject to state regulation, "even though the gas be brought from another State and drawn for distribution directly from interstate mains; and this is so

whether the local distribution be made by the transporting company or by independent distributing companies," *Missouri* v. *Kansas Gas Co.*, *supra*, at 309, but that the wholesale sale of gas in interstate commerce was not subject to state regulation even though some of the gas being sold was produced within the State. Our rationale was that "[t]ransportation of gas from one State to another is interstate commerce; and the sale and delivery of it to the local distributing companies is a part of such commerce," 265 U. S., at 307, but that "[w]ith the delivery of the gas to the distributing companies . . . the interstate movement ends" and the further "effect on interstate commerce, if there be any, is indirect and incidental," *id.*, at 308. See also, *e. g.*, *State Corporation Comm'n* v. *Wichita Gas Co.*, 290 U. S. 561, 563–564 (1934); *East Ohio Gas Co.* v. *Tax Comm'n of Ohio*, 283 U. S. 465, 470–471 (1931).

The wholesale/retail line drawn in *Landon* and *Kansas Gas* was applied to electric utilities in *Public Utilities Comm'n of R. I.* v. *Attleboro Steam & Electric Co.*, 273 U. S. 83 (1927). *Attleboro* involved an attempt by the Rhode Island Public Utilities Commission to regulate the rates at which the Narragansett Electric Lighting Co.—a Rhode Island utility— could sell electric current to a Massachusetts distributor. We struck down the regulation, holding that, because it involved a transaction at wholesale, it imposed a "direct" rather than an "indirect" burden on interstate commerce. In doing so we held that it was immaterial "that the general business of the Narragansett Company appears to be chiefly local," *id.*, at 90, or that the State Commission grounded its assertion of jurisdiction on the need to facilitate the regulation of the company's retail sales to its Rhode Island customers.

As a direct result of *Attleboro* and its predecessor cases, Congress undertook to establish federal regulation over most of the wholesale transactions of electric and gas utilities engaged in interstate commerce, and created the Federal Power Commission (FPC) (now the Federal Energy Regulatory Commission) (FERC) to carry out that task. See Fed-

eral Power Act of 1935 (Title II of the Public Utility Act of 1935), 49 Stat. 838–863; Natural Gas Act of 1938, 52 Stat. 821.[1] Although the main purpose of this legislation was to "'fill the gap'" created by *Attleboro* and its predecessors, see *New England Power Co.* v. *New Hampshire, supra,* at 340; *United States* v. *Public Utilities Comm'n of California,* 345 U. S. 295, 311 (1953), it nevertheless shifted this Court's main focus—in determining the permissible scope of state regulation of utilities—from the constitutional issues that concerned us in *Attleboro* to analyses of legislative intent.[2] For example, in *Illinois Gas Co.* v. *Public Service Co.,* 314 U. S. 498 (1942), we were required to determine whether the sale of natural gas by an Illinois pipeline corporation to local distributors in Illinois was subject to the jurisdiction of the Federal Power Commission or the Illinois Commerce Commission. We began our analysis by describing the whole-sale/retail test drawn in *Landon, Kansas Gas, Attleboro,* and other cases. We then noted another line of cases—relating to both utility regulation and other Commerce Clause issues—in which the Court was "less concerned to find a point in time and space where the interstate commerce . . . ends and intrastate commerce begins, and . . . looked [instead] to the nature of the state regulation involved, the objective of the state, and the effect of the regulation upon the national interest in the commerce." 314 U. S., at 505. We stated:

> "In the absence of any controlling act of Congress, we should now be faced with the question whether the interest of the state in the present regulation of the sale and distribution of gas transported into the state, balanced against the effect of such control on the commerce in its

---

[1] See *FPC* v. *Southern California Edison Co.,* 376 U. S. 205 (1964), and *United States* v. *Public Utilities Comm'n of California,* 345 U. S. 295 (1953), for discussions of the relevant legislative history.

[2] But cf., *e. g., New England Power Co.* v. *New Hampshire,* 455 U. S. 331 (1982).

national aspect, is a more reliable touchstone for ascertaining state power than the mechanical distinctions on which appellee relies." *Id.*, at 506.

We concluded, however, that we were "under no necessity of making that choice here," *ibid.*, for Congress, partly to avoid "drawing the precise line between state and federal power by the litigation of particular cases," *id.*, at 507, had adopted the "mechanical" line established in *Kansas Gas* and *Attleboro* as the statutory line dividing federal and state jurisdiction.[3]

The analysis in *Illinois Gas* was reaffirmed in subsequent cases and extended to similar jurisdictional disputes arising under the Federal Power Act. See, *e. g., Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n of Ind.*, 332 U. S. 507, 517 (1947) ("The line of the statute was . . . clear and complete. It cut sharply and cleanly between sales for resale and direct sales for consumptive uses"); *United States* v. *Public Utilities Comm'n of California, supra,* at 308 ("Congress interpreted *[Attleboro]* as prohibiting state control of wholesale rates in interstate commerce for resale, and so armed the Federal Power Commission with precisely that power") (footnote omitted); *FPC* v. *Southern California Edison Co.*, 376 U. S. 205 (1964). The last of these cases is particularly noteworthy for our purposes here, for it held, among other things, that under the *Attleboro* test, a California utility that received some of its power from out-of-state was subject to federal and not state regulation in its sales of electricity to a California municipality that resold the bulk of the power to others. See also *FPC* v. *Florida Power & Light Co.*, 404 U. S. 453 (1972).

## II

AECC is one of a large number of customer-owned rural power cooperatives established with loan funds and technical assistance provided by the federal Rural Electrification Ad-

---

[3] We make no attempt in this opinion to trace the subsequent development of these statutes, except as may be relevant to our decision today.

ministration (REA) in order to bring electric power to parts of the country not adequately served by commercial utility companies. See generally Rural Electrification Act of 1936, 49 Stat. 1363, 7 U. S. C. § 901 *et seq.* (1976 ed. and Supp. V). Unlike most rural power cooperatives, however, AECC does not provide power directly to individual consumers. Rather, its sole members and primary customers are 17 smaller Arkansas rural power cooperatives who in turn serve the ultimate consumer. AECC is governed by a Board of Directors consisting of 34 persons, 2 designated by each of the 17 member cooperatives. Among the duties of this Board is to `determine the rates charged the member cooperatives by AECC.

AECC obtains most of its energy from a number of powerplants located in Arkansas, which it wholly or partially owns. Moreover, it sells most of what it generates to its member cooperatives. Like most electric utilities, however, AECC also participates in a variety of sale and exchange arrangements with other producers, buying power when its own need or the excess capacity of other utilities is high, and selling it when the opposite is the case. By virtue of these arrangements, AECC is ultimately tied into a multicompany and multistate "grid," and, electricity being what it is, see *FPC* v. *Florida Power & Light Co., supra,* it is difficult to say with any confidence that the power AECC provides to its member cooperatives at any particular moment originated entirely within the State.

The retail rates charged by AECC's member cooperatives are regulated by the Arkansas PSC. If AECC were not a rural power cooperative, the wholesale rates it charges to its members would, under the scheme we described in Part I, *supra,* be subject exclusively to federal regulation. See § 201(b) of the Federal Power Act, 49 Stat. 838, 847, as amended, 16 U. S. C. § 824(b) (1976 ed., Supp. V); *FPC* v. *Southern California Edison Co., supra; FPC* v. *Florida Power & Light Co., supra.* In 1967, however, the FPC held

that it had no jurisdiction under the Federal Power Act to regulate wholesale rates charged by rural power cooperatives under the supervision of the REA. *Dairyland Power Cooperative*, 37 F. P. C. 12, 67 P. U. R. 3d 340.[4] Thus, until the proceedings that culminated in this case, the rates charged by AECC to its member cooperatives were not subject, at either the federal or the state level, to the type of pervasive rate regulation almost universally associated with electric utilities in this country.[5]

In 1979, after public hearings, the Arkansas PSC entered an order asserting jurisdiction over the rates charged by AECC to its member cooperatives. The PSC based its decision on the same Arkansas statutes that authorize its regulation of rural power cooperatives engaged in retail sales of electricity. App. 52–53; see Ark. Stat. Ann. §§ 73–201(a), 73–202(a), 73–202.1 (1979). In response to objections raised by AECC, the PSC held that state regulation was neither forbidden by *Attleboro* or *FPC* v. *Southern California Edison Co., supra,* nor pre-empted by the Federal Power Act or the Rural Electrification Act. On review, the Pulaski County Circuit Court set aside the PSC's order, but the Arkansas Supreme Court reversed and upheld the jurisdiction of the PSC. 273 Ark. 170, 618 S. W. 2d 151 (1981). We noted probable jurisdiction. 457 U. S. 1130 (1982).

In its brief on the merits, AECC presses both the Commerce Clause and the pre-emption arguments rejected by the Arkansas PSC.[6] We consider the statutory argument first.

---

[4] The United States Court of Appeals for the District of Columbia Circuit reached the same conclusion in *Salt River Project Agricultural Improvement & Power District* v. *FPC*, 129 U. S. App. D. C. 117, 391 F. 2d 470 (1968). But cf. n. 7, *infra.*

[5] We discuss *infra,* at 385–388, the role of the REA in regulating the rates set by rural electric cooperatives. We also note *infra,* at 394, the argument that AECC, because it is owned and directly managed by its 17 principal customers, is essentially self-regulating.

[6] There is a legitimate question in this case as to whether the pre-emption argument advanced by AECC is properly before us. AECC's jurisdic-

## III

The basic principles governing the pre-emption of state regulation by federal law are well known. See *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta,* 458 U. S. 141 (1982); *Jones* v. *Rath Packing Co.,* 430 U. S. 519, 525–526 (1977). In this case, we are concerned with the possible pre-emptive effects of two federal statutes and administrative acts taken pursuant to them: the Federal Power Act and the Rural Electrification Act.

## A

As we discuss *supra,* at 381–382, the FPC determined in 1967 that it did not have jurisdiction under the Federal Power Act over the wholesale rates charged by rural power cooperatives.[7]  That does not dispose of the possibility that

tional statement raised only the pure Commerce Clause issue, and did not offer pre-emption as a separate ground for reversal.   Only after the United States, as *amicus curiae,* relied strongly on a pre-emption argument did AECC devote considerable attention to it in its brief on the merits.   Nevertheless, the relationship between legislative and judicial enforcement of the Commerce Clause is close enough for the pre-emption issue to come, if by the barest of margins, within those "subsidiary question[s] fairly included" in the principal question on appeal.   See this Court's Rule 15.1(a); *Brown* v. *Socialist Workers '74 Campaign Committee,* 459 U. S. 87, 94, n. 9 (1982); *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365, 371, n. 4 (1967).   See also *Vance* v. *Terrazas,* 444 U. S. 252, 258, n. 5 (1980).

A more serious, because jurisdictional, problem was raised by AECC's counsel's statement at oral argument that, although the pre-emption issue was raised before the Arkansas PSC, it may not have been raised before the Arkansas Supreme Court.   Tr. of Oral Arg. 8.   As it turns out, however, the pre-emption argument *was* raised, if half-heartedly, both in AECC's petition for review in the Pulaski County Circuit Court, Record 104, and in its brief in the Arkansas Supreme Court, Brief for Appellee in No. 80–313, pp. 16–17.

[7] Neither party here has challenged the correctness of that determination, and we express no opinion on the subject.   Were FERC or the courts ever definitively to overrule *Dairyland Power Cooperative,* 37 F. P. C. 12, 67 P. U. R. 3d 340 (1967), and decide that the FPC did have jurisdiction, we would obviously be faced with a very different pre-emption question.

the Federal Power Act pre-empts state regulation, however, because a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate. See *NLRB* v. *Nash-Finch Co.*, 404 U. S. 138, 144 (1971); cf. *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta, supra*, at 155. In this case, however, nothing in the language, history, or policy of the Federal Power Act suggests such a conclusion. Congress' purpose in 1935 was to fill a regulatory gap, not to perpetuate one.[8] Moreover, the FPC's refusal in 1967 to assert jurisdiction over rural power cooperatives does not suggest anything to the contrary. In that decision, the FPC simply held that, purely as a jurisdictional matter, the relevant statutes gave the REA exclusive authority among federal agencies to regulate rural power cooperatives. *Dairyland Power Cooperative*, 37 F. P. C., at 26, 67 P. U. R. 3d, at 352–354. It did not determine that, as a matter of policy, rural power cooperatives that are engaged in sales for resale should be left unregulated.[9] Indeed, the

---

[8] As the dissent suggests, Congress in 1935 almost certainly thought that state regulation of the wholesale activities of rural power cooperatives operating in interstate commerce would be barred under this Court's *Attleboro* doctrine. Cf. *infra*, at 389–390. To the extent that Congress sought to freeze its perception of *Attleboro* into law, however, it did so only as a means to accomplishing the end of workable federal regulation, not as an end in itself. If we start from the premise that Congress did not intend to subject rural power cooperatives to the federal regulatory scheme it was creating in the 1935 legislation, see n. 7, *supra*, then it would not have served Congress' purposes to pre-empt state regulation over such cooperatives. Significantly, the dissent does not put forward any argument to the contrary.

[9] Similarly, although the Court of Appeals opinion in *Salt River Project Agricultural Improvement & Power District* v. *FPC, supra*, did suggest in its initial description of rural power cooperatives that they were effectively self-regulating as to rates, *id.*, at 120, 391 F. 2d, at 473, its conclusions of

FPC's published opinion concluded by specifically urging Congress to amend the statute and grant it jurisdiction over at least some of the activities of such utilities. *Id.*, at 28, 67 P. U. R. 3d, at 355. We therefore find no bar to the PSC's assertion of jurisdiction either in the Federal Power Act itself or in the FPC's *Dairyland* decision.

### B

We turn then to the REA. Nothing in the Rural Electrification Act expressly pre-empts state rate regulation of power cooperatives financed by the REA. Nevertheless, AECC and certain of the *amici*, including the United States, argue that the PSC's assertion of jurisdiction interferes with the REA's pervasive involvement in the management of the rural power cooperatives to which it loans funds, and may frustrate important federal interests. As the United States expresses this position in its brief:

> "The terms and conditions of a loan to a generation and transmission association [such as AECC] require the borrower's rates and rate structure to be approved by the REA, not just at its inception, but throughout the term of the loan. And in passing on rate questions, the REA considers, not only the security thus afforded for payment of the loan, but also the suitability of the rates and structure to the Act's underlying purpose of facilitating the availability of cheap electric power in rural America.

> .      .      .      .      .

> "The spectre of state regulation poses a threat to the REA loan because of the possibility that the state may refuse to permit its cooperatives to pay a generation and transmission association the rates to which they agreed

law upholding the FPC's refusal to take jurisdiction were grounded fundamentally on considerations of interagency jurisdiction.

and upon the security of which the loan was issued. Moreover, the policy behind the Rural Electrification Act is at stake. . . . [T]he REA has always encouraged its borrowers to establish affordable rates for all of its subscribers. In this way, costs are shared in a manner which, over the long run, benefits all by the creation of a sound, extensive rural electric system. If the state were to insist on a restructuring of the generation and transmission association's rate structure, the policies of the Act would be undermined." Brief for United States as *Amicus Curiae* 12–13.

As the United States and AECC admit, the REA is a lending agency rather than a classic public utility regulatory body in the mold of either FERC or the Arkansas PSC. This case might therefore present the interesting question of how we should in general define the proper relationship between the requirements established by federal lending agencies and the more direct regulatory activities of state authorities. We need not examine the issue at that level of abstraction, however, because we have quite specific indications of congressional and administrative intent on precisely the question before us. Cf. *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta,* 458 U. S., at 159, n. 14.

First, the legislative history of the Rural Electrification Act makes abundantly clear that, although the REA was expected to play a role in assisting the fledgling rural power cooperatives in setting their rate structures, it would do so within the constraints of existing state regulatory schemes.[10] See, *e. g.*, 80 Cong. Rec. 5316 (1936) (Rep. Lea); Hearing on S. 3483 before the House Committee on Interstate and For-

---

[10] All this is not to say that officials of the REA have always welcomed state regulation of rural power cooperatives, or thought it was a good idea. See, *e. g.*, REA, Rural Electrification on the March, pp. 25–26 (1938). But, of course, such expressions of opinion do not constitute sufficient grounds for pre-emption.

eign Commerce, 74th Cong., 2d Sess., 30, 37, 51, 52 (1936). Admittedly, the legislative record focuses on *retail* rates charged by rural power cooperatives, but with respect to the particular concerns that AECC and *amici* have pressed in support of pre-emption, we can discern no relevant difference between wholesale and retail rates: both types of rates implicate the Government's interest in securing its loans, and, if anything, retail rates more directly implicate the Government's interest in assuring that individual rural households receive electricity at a reasonable price.[11]

Second, the present published policy of the REA is wholly inconsistent with pre-emption of state regulatory jurisdiction. Although generating cooperatives dealing with the REA must obtain the agency's approval whenever they modify their wholesale rates,[12] the same document setting out guidelines for what constitute proper wholesale rates also states: "Borrowers must, of course, submit proposed rate changes to any regulatory commissions having jurisdiction and must seek approval in the manner prescribed by those

---

[11] Contrary to the suggestion in the dissent, we do not infer from this legislative history that Congress either "authorized" or "expected" "state regulation that this Court had barred States from engaging in." *Post*, at 400. See n. 15, *infra;* n. 8, *supra.* The relevant inquiry, however, is not whether Congress authorized or expected such regulation, but whether it intended by its own actions to *forbid* it. Cf. *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n, ante,* p. 190. In answering that question, we look quite naturally to whether Congress intended in any way to forbid state regulation of rural power cooperatives.

[12] How well this oversight works in practice may be another matter. See REA Bulletin 111–1, Memorandum from REA Administrator to All REA Electric Borrowers, Managers, and Board Presidents (Mar. 18, 1970) (complaining that some borrowers had neglected to obtain the necessary review and approval by the REA). As the United States admits in its brief, "the REA does not control the rates and rate structure of . . . generation and transmission associations as thoroughly or with the formality of the Federal Power Commission." Brief for United States as *Amicus Curiae* 12.

commissions." REA Bulletin 111–4, pp. 1–2 (1972).[13] Since Bulletin 111–4 was issued subsequent to the FPC's decision in *Dairyland*, the "regulatory commissions having jurisdiction" to which it refers can only be state regulatory agencies such as the Arkansas PSC.[14] Moreover, it is worth noting that the REA's supervision of wholesale rates charged by its borrowers appears to be no more exclusive than its supervision over their retail rates, REA Bulletin 112–2 (1971); REA Bulletin 112–1, pp. 1, 16 (1979), and it has never been contended that state regulatory jurisdiction over those rates is pre-empted, see REA Bulletin 112–2, at 5; Brief for United States as *Amicus Curiae* 11.[15]

There may come a time when the REA changes its present policy, and announces that state rate regulation of rural

---

[13] See also REA Bulletin 3–1, p. 1 (1955) ("It is the responsibility of borrowers . . . to initiate and carry forward proceedings before regulatory bodies of appropriate jurisdiction in which all required certificates of convenience and necessity, franchises, and rate, tariff and other approvals are sought").

[14] The dissent faults us for finding significance in REA Bulletin 111–4. *Post*, at 400–401. In particular, it speculates that "the statement [in Bulletin 111–4] could have been intended [only] to direct wholly *intrastate* cooperatives to comply with the orders of state commissions." *Post*, at 401 (emphasis added). It is our understanding, however, that, as of 1972, all the generating cooperatives in the country, except perhaps those in Texas, were tied into an interstate grid. If this is true, it is unlikely that the REA would have used as broad and unqualified language as it did for the sole purpose of directing cooperatives in one State to submit to state regulation.

[15] In light of our discussion in text, an argument might be made that state rate regulation of rural power cooperatives engaged in sales for resale is not only not pre-empted, but is indeed affirmatively authorized by the Rural Electrification Act. Cf. *Western & Southern Life Insurance Co.* v. *Board of Equalization*, 451 U. S. 648, 652–653 (1981); *Prudential Insurance Co.* v. *Benjamin*, 328 U. S. 408, 423–426 (1946). On balance, however, it seems most likely that Congress and the REA intended no more than to leave in place state regulation otherwise consistent with the requirements of the Commerce Clause. See *New England Power Co.* v. *New Hampshire*, 455 U. S., at 341; *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27, 49 (1980).

power cooperatives is inconsistent with federal policy. If that were to happen, and if such a rule was valid under the Rural Electrification Act, it would of course pre-empt any further exercise of jurisdiction by the Arkansas PSC. See *Ray* v. *Atlantic Richfield Co.*, 435 U. S. 151, 171–172 (1978); cf. *Fidelity Federal Savings & Loan Assn.* v. *De la Cuesta*, 458 U. S., at 154; *Free* v. *Bland*, 369 U. S. 663, 668 (1962). Similarly, as Arkansas already recognizes, see Ark. Stat. Ann. § 73–202.3 (1979), the PSC can make no regulation affecting rural power cooperatives which conflicts with particular regulations promulgated by the REA. Moreover, even without an explicit statement from the REA, a particular rate set by the Arkansas PSC may so seriously compromise important federal interests, including the ability of the AECC to repay its loans, as to be implicitly pre-empted by the Rural Electrification Act. See *Jones* v. *Rath Packing Co.*, 430 U. S., at 525–526, 540–543; cf. *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 231–232 (1947). We will not, however, in this facial challenge to the PSC's mere assertion of jurisdiction, assume that such a hypothetical event is so likely to occur as to preclude the setting of any rates at all. *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 130–131 (1978). See generally *Merrill Lynch, Pierce, Fenner & Smith* v. *Ware, Inc.*, 414 U. S. 117, 136–140 (1973).

## IV

### A

Even in the absence of congressional legislation, "the Commerce Clause contains an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce." *Western & Southern Life Insurance Co.* v. *Board of Equalization*, 451 U. S. 648, 652 (1981) (footnote omitted). If the constitutional rule articulated in *Attleboro* were applied in this case, it would require setting aside the PSC's assertion of jurisdiction over AECC, since AECC, like

the utility in *Attleboro*, sells at wholesale electric energy transmitted in interstate commerce.[16]   As we pointed out in *Illinois Gas*, however, see *supra*, at 379–380, it is difficult to square the mechanical line drawn in *Attleboro* and its predecessor cases, and based on a supposedly precise division between "direct" and "indirect" effects on interstate commerce, with the general trend in our modern Commerce Clause jurisprudence to look in every case to "the nature of the state regulation involved, the objective of the state, and the effect of the regulation upon the national interest in the commerce." 314 U. S., at 505.   Cf. *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970).   This modern jurisprudence has usually, although not always, given more latitude to state regulation than the more categorical approach of which *Attleboro* is one example. But in any event, it recognizes, as *Attleboro* did not, that there is an "infinite variety of cases, in which regulation of local matters may also operate as a regulation of [interstate] commerce, [and] in which reconciliation of the conflicting claims of state and national power is to be attained only by some appraisal and accommodation of the competing demands of the state and national interests involved."   *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 768–769 (1945).   See *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456 (1981); *Pike* v. *Bruce Church, Inc., supra*, at 142; *Parker* v. *Brown*, 317 U. S. 341, 362–363 (1943).

We are faced, then, in this case, with precisely the question left open in *Illinois Gas:* Do we follow the mechanical test set out in *Attleboro*, or the balance-of-interests test ap-

---

[16] It is possible to distinguish *Attleboro* on its facts, since it was concerned with the sale of power by a company in one State to a wholesale customer in another State.   Nevertheless, it is much more difficult to dismiss the broad principle articulated in *Attleboro* and its predecessor cases, especially in light of the reading given to those cases in our subsequent decisions.   See, *e. g., Illinois Gas Co.* v. *Public Service Co.*, 314 U. S. 498, 504, 508 (1942); *FPC* v. *Southern California Edison Co.*, 376 U. S., at 212, 214.

plied in our Commerce Clause cases for roughly the past 45 years? Of course, the principle of *stare decisis* counsels us, here as elsewhere, not lightly to set aside specific guidance of the sort we find in *Attleboro*. Nevertheless, the same respect for the rule of law that requires us to seek consistency over time also requires us, if with somewhat more caution and deliberation, to seek consistency in the interpretation of an area of law at any given time. Thus, in recent years, this Court has explicitly abandoned a series of formalistic distinctions—akin to the one in *Attleboro*—which once both defined and controlled various corners of Commerce Clause doctrine. See, *e. g.*, *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609 (1981) (abandoning rule that constitutionality of state severance tax depended on whether it was imposed on goods prior to their entry into interstate commerce); *Hughes* v. *Oklahoma*, 441 U. S. 322 (1979) (rejecting rule, based on legal fiction of ownership, that States had absolute control over disposition of wild animals within their borders); *Washington Revenue Dept.* v. *Association of Washington Stevedoring Cos.*, 435 U. S. 734 (1978) (rejecting rule that tax on stevedoring automatically constituted an impermissible "direct" tax on interstate commerce); cf. *Michelin Tire Corp.* v. *Wages*, 423 U. S. 276 (1976) (overruling "original package" rule in Import-Export Clause doctrine).

The wholesale/retail line drawn in *Attleboro* is no less anachronistic than the rules we rejected in the cited cases. Moreover, we have had no occasion, since the 1930's, either to apply that line or to reject it in a case not governed by statute. The difficulty of harmonizing *Attleboro* with modern Commerce Clause doctrine has been apparent for a long time, so much so that we expressed skepticism about its continuing soundness as a constitutional, rather than statutory, rule in *Illinois Gas*. Our constitutional review of state utility regulation in related contexts has not treated it as a special province insulated from our general Commerce Clause jurisprudence. See *New England Power Co.* v. *New Hampshire*,

455 U. S. 331 (1982); *Panhandle Eastern Pipe Line Co.* v. *Michigan Public Service Comm'n*, 341 U. S. 329, 336–337 (1951). Finally, we can see no strong reliance interests that would be threatened by our rejection today of the mechanical line drawn in *Attleboro*. Therefore, here, as in few other contexts, the burden shifts somewhat to the party defending the rule to show why it should be applied in this case.

AECC makes essentially two arguments, in the course of its brief and oral argument, for why *Attleboro* should govern here. First, it contends that the constitutional import of the *Attleboro* line was reaffirmed in *FPC* v. *Southern California Edison Co.*, 376 U. S. 205, which was decided in 1964. This claim is simply wrong. *Southern California Edison Co.* did no more than interpret the Federal Power Act, and it cited with approval the constitutional agnosticism spelled out at length in *Illinois Gas*. See 376 U. S., at 214.

Second, AECC argues that, although "[t]he Attleboro line of cases established an admittedly mechanical test for determining the limitation of state power, . . . the court arrived at that test by careful consideration of what was national importance as opposed to what was essentially local and could be, therefore, regulated by the states," Tr. of Oral Arg. 11, and that nothing that has happened since has changed that implicit balance. This contention is also unpersuasive. Even if we assume—as is not necessarily the case, see *supra*, at 390—that the underlying substantive concerns motivating the Court to strike down the state regulation in *Attleboro* were identical to the considerations articulated in our more recent cases, that in itself does not explain why the bright-line test drawn in *Attleboro* should be applied to the somewhat different set of facts present here, see n. 16, *supra*. Bright lines are important and necessary in many areas of the law, including constitutional law. Moreover, *Southern California Edison Co.* and other cases have made it clear that the Federal Power Act draws a bright line between the respective jurisdictions of federal and state regulatory agencies. Neverthe-

less, AECC has given us no good reason why a bright line between state regulation and *unexercised* federal power is more justifiable here than in other contexts in which we must interpret the negative implications of the Commerce Clause.

*Attleboro* and its predecessors are by no means judicial atrocities, plainly wrong at the time they were decided. In the first place, it is not entirely insignificant, quite apart from the sort of statutory analysis in which we engaged in Part III, *supra,* that those cases were decided in a day before Congress had already spoken with some breadth on the subject of utility regulation. Cf. *Duckworth* v. *Arkansas,* 314 U. S. 390, 400 (1941) (Jackson, J., concurring in result). This Court was in 1927 the sole authority safeguarding federal interests over a wide range of state utility regulation. Under those circumstances, drawing a fairly restrictive bright line may have made considerable sense. Indeed, the line the Court drew in *Attleboro,* though by no means perfect, would undoubtedly lead in a large number of cases to results entirely consistent with present-day doctrine. Second, the judicial turn of mind apparent in *Attleboro,* although problematic in many respects, can also be a healthy counterweight in many contexts to an otherwise too-easy dilution of guarantees contained in the Constitution. Nevertheless, *Attleboro* can no longer be thought to provide the sole standard by which to decide this case, and we proceed instead to undertake an analysis grounded more solidly in our modern cases.

B

*Illinois Gas* cited as examples of the less formalistic approach to the Commerce Clause such now-classic cases as *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177 (1938), and *Duckworth* v. *Arkansas, supra.* One recent reformulation of the test established in those cases is found in *Pike* v. *Bruce Church, Inc.:*

"Where [a] statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on inter-

state commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." 397 U. S., at 142 (citation omitted).

Applying the *Bruce Church* test to this case is relatively simple. The most serious concern identified in *Bruce Church*—economic protectionism—is not implicated here. Compare *Philadelphia* v. *New Jersey*, 437 U. S. 617 (1978), with *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S., at 471–472. Moreover, state regulation of the wholesale rates charged by AECC to its members is well within the scope of "legitimate local public interests," particularly considering that although AECC is tied into an interstate grid, its basic operation consists of supplying power from generating facilities located within the State to member cooperatives, all of which are located within the State. Cf. *id.*, at 473, n. 17.

An argument could be made that, because AECC's Board of Directors consists exclusively of representatives of its 17 customers, it is effectively self-regulating, and that therefore any state regulation is not supported by an appreciable state interest. Cf. *Salt River Project Agricultural Improvement & Power District* v. *FPC*, 129 U. S. App. D. C. 117, 120, 391 F. 2d 470, 473 (1968). Nevertheless, there is evidence that even cooperative power utilities may engage in economically inefficient behavior, see generally R. Schmalensee, The Control of Natural Monopolies 91–93 (1979), and sources cited, and we will not under these circumstances second-guess the State's judgment that some degree of governmental oversight is warranted. See *Clover Leaf Creamery Co.*, *supra*,

at 469, 473; *Exxon Corp.* v. *Governor of Maryland*, 437
U. S., at 128.[17]

Finally, although we recognize that the PSC's regulation of
the rates AECC charges to its members will have an inci-
dental effect on interstate commerce, we are convinced that
"the burden imposed on such commerce is not clearly exces-
sive in relation to the putative local benefits." Part of the
power AECC sells is received from out-of-state. But the
same is true of most *retail* utilities, and the national fabric
does not seem to have been seriously disturbed by leaving
regulation of retail utility rates largely to the States. Simi-
larly, it is true that regulation of the prices AECC charges to
its members may have some effect on the price structure of
the interstate grid of which AECC is a part. But, again, we
find it difficult to distinguish AECC in this respect from most
relatively large utilities which sell power both directly to the
public and to other utilities. It is not inconceivable that a
particular rate structure required by the Arkansas PSC
would be so unreasonable as to disturb appreciably the inter-
state market for electric power. But, as we said in our dis-
cussion of the pre-emption issue, see *supra*, at 389, we are
not willing to allow such a hypothetical possibility to control
this facial challenge to the PSC's mere assertion of regulatory
jurisdiction. See *Exxon Corp.* v. *Governor of Maryland*,
*supra*, at 128–129.

---

[17] Note also that the Arkansas PSC's regulation of AECC's rates can be
justified, if on no other grounds, as facilitating its regulation of the retail
rates charged by AECC's members: The PSC's inquiry into the reasonable-
ness of those retail rates must already include an inquiry into the reason-
ableness of the wholesale rates upon which they in part depend. More-
over, if the retail rates are found unreasonable (by virtue of the wholesale
rates being unreasonable), it seems likely that the retail cooperatives will,
through their representatives on AECC's Board of Directors, vote for a
reduction in the wholesale rates. Regulating AECC's rates directly al-
lows the PSC both to rationalize and to streamline this process, and also to
obtain the necessary information directly from its source.

## V

On this record, the PSC's assertion of jurisdiction over the wholesale rates charged by AECC to its members offends neither the Supremacy Clause nor the Commerce Clause. The judgment of the Arkansas Supreme Court is

*Affirmed.*

JUSTICE WHITE, with whom THE CHIEF JUSTICE joins, dissenting.

I respectfully dissent. I believe that state regulation of rural cooperative wholesale power rates is pre-empted because Congress has occupied the field of wholesale power rate regulation.

Several years before the expansion of the jurisdiction of the Federal Power Commission to regulate interstate wholesale power rates, this Court had invalidated as repugnant to the Commerce Clause state attempts to regulate interstate power wholesale rates. *Public Utilities Comm'n of R. I. v. Attleboro Steam & Electric Co.*, 273 U. S. 83 (1927). The Court drew a bright line demarking the permissible scope of state regulation. States could regulate retail sales of energy in interstate commerce, but could not regulate wholesale sales of energy in interstate commerce. "*Attleboro* declared state regulation of interstate transmission of power for resale forbidden as a direct burden on commerce." *United States v. Public Utilities Comm'n of Cal.*, 345 U. S. 295, 304 (1953). Had there been at the time of *Attleboro* a cooperative that generated electricity and sold it for resale across state lines, state regulation of such sales would have been foreclosed as an interference with commerce. I do not see how that conclusion could be questioned.

Nor is it sensible to argue that such a cooperative's rates became subject to state regulation when a few years later Congress subjected to federal regulation most wholesale

rates previously unregulated. Quite the contrary is true. Although under the relevant cases, with which it was surely familiar, *In re Rahrer*, 140 U. S. 545 (1891); *Clark Distilling Co.* v. *Western Maryland R. Co.*, 242 U. S. 311 (1917),[1] Congress could have authorized state regulation of such rates, it chose not to do so. See *New England Power Co.* v. *New Hampshire*, 455 U. S. 331, 341 (1982) ("Nothing in the legislative history or language of [16 U. S. C. § 824(b)] evinces a congressional intent 'to alter the limits of state power otherwise imposed by the Commerce Clause,' . . . or to modify the earlier holdings of this Court concerning the limits of state authority to restrain interstate trade"). Instead Congress enacted Titles II and III of the Federal Power Act, 49 Stat. 847, 16 U. S. C. § 824 *et seq.* (1976 ed. and Supp. V), in 1935 (and the Natural Gas Act, 52 Stat. 821, 15 U. S. C. § 717 *et seq.* (1976 ed. and Supp. V), in 1938) expressly adopting the *Attleboro* bright-line demarkation, see *FPC* v. *Southern California Edison Co.*, 376 U. S. 205 (1964); *United States* v. *Public Utilities Comm'n of Cal., supra.* That Act provided that the FPC would set just and reasonable rates for public utilities that sold electric power at wholesale. 16 U. S. C. § 824d(a). The term public utility was defined broadly. 16

---

[1] *Clark Distilling* upheld the Webb-Kenyon Act, 37 Stat. 699, prohibiting importation into a State of liquor to be received, possessed, or sold in violation of the laws of the State. About the time Congress passed the Public Utilities Holding Company Act, Congress also enacted a law substantially similar to the Webb-Kenyon Act, the Ashurst-Sumners Act, 49 Stat. 494, which made it unlawful to transport goods made by convict labor into any State where the goods were to be received, sold, or possessed in violation of its law. See *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.*, 299 U. S. 334, 351 (1937) ("The Ashurst-Sumners Act as to interstate transportation of convict-made goods has substantially the same provisions as the Webb-Kenyon Act as to intoxicating liquors. . . . The subject of the prohibited traffic is different, the effects of the traffic are different, but the underlying principle is the same").

But see *Cooley* v. *Board of Wardens*, 12 How. 299 (1852) (dicta).

U. S. C. § 824(e) (1976 ed., Supp. V).[2]  Nowhere in the Act is there any indication that state authority to regulate wholesale rates was in any way expanded beyond that permitted by the Commerce Clause as interpreted in *Attleboro*.  "What Congress did was to adopt the test developed in the *Attleboro* line [of cases] which denied state power to regulate a 'sale at wholesale to local distributing companies.'"  *FPC* v. *Southern California Edison Co., supra,* at 214.  "The line of the statute was thus clear and complete.  It cut sharply and cleanly between sales for resale and direct sales for consumptive uses.  No exceptions were made in either category for particular uses, quantities or otherwise." *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n of Indiana,* 332 U. S. 507, 517 (1947).

Congress thus affirmatively asserted jurisdiction over wholesale rates charged by all entities, either by giving the FPC jurisdiction or by freeing such entities from regulation because of their quasi-governmental nature.  Neither of these options leaves room for state control of wholesale rates charged by public utilities (except those that are arms of the State or its political subdivisions); the first gives sole control to the FPC, the latter can be viewed as a decision that the rates of governmental and quasi-governmental entities are "best left *unregulated*," *ante,* at 384.

The Rural Electrification Act, 49 Stat. 1363, 7 U. S. C. § 901 *et seq.* (1976 ed. and Supp. V), was passed in 1936, and the Federal Power Commission later held that cooperatives such as appellant are not within its regulatory authority, not because they were exempted by the Rural Electrification Act, but because they are beyond the jurisdiction conferred

---

[2] Section 824(e) defines a public utility as "any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter."  Section 796(4) defines a person as "an individual or a corporation."  Section 796(8) defines a corporation as "any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not . . . ."

on the Commission by the Federal Power Act.   *Dairyland
Power Cooperative*, 37.F. P. C. 12, 67 P. U. R. 3d 340 (1967).[3]
This left the cooperatives' wholesale rates unregulated and
beyond the reach of state authority, just as they would have
been immediately after *Attleboro*.   In the 47 years since the
passage of the Rural Electrification Act, Congress has not
sought to authorize state regulation of the wholesale rates
charged by rural cooperatives.   It has adhered to its whole-
sale-retail boundary between federal and state authority.   In
all these years, there has been no state rate regulation of
rural cooperatives' wholesale rates.   This was the necessary
result of Congress' adopting as its own the *Attleboro* line and
thereby occupying the field of wholesale regulation.[4]

------

[3] The Court accepts the holding in *Dairyland* that the FPC lacks jurisdic-
tion over rural cooperatives.   It then notes that the FPC believed that
regulation of some rural cooperatives would be proper.   From all this the
Court concludes that the lack of regulation of rural cooperatives does not
represent a judgment that their wholesale rates are "best left *un*regu-
lated," *ante*, at 384.   The FPC, however, did not suggest that the State
had any role to play in filling this regulatory void.   Furthermore, there is
no evidence that Congress thinks, or thought, that the cooperatives' whole-
sale rates should be regulated, or that, if they should be, the States rather
than the FPC or the Rural Electrification Administration should do the
regulating.

[4] Indeed, the only indication of the views of Congress with respect to
the question of jurisdiction over the rates of rural cooperatives is the spate
of bills introduced around the time that the FPC was considering the
*Dairyland Power* case.   These bills were designed to add rural cooper-
atives to the list of governmental instrumentalities exempt from FPC ju-
risdiction, *e. g.*, H. R. 5348, 90th Cong., 1st Sess. (1967); H. R. 8426, 90th
Cong., 1st Sess. (1967), and reaffirm the jurisdiction of the Rural Electrifi-
cation Administration over rural cooperatives.   S. 1365, 90th Cong., 1st
Sess. (1967) (introduced by Sens. Holland and Smathers); H. R. 7799, 90th
Cong., 1st Sess. (1967) (introduced by Rep. Fascell).   The Department of
Justice, the FPC, and the Department of Agriculture (of which the REA
is a part) took the position that the legislation was not needed to protect
cooperatives from FPC control in light of the Commission's decision, in
*Dairyland Power* (which had been announced by the start of the hearings
on the bill), that rural cooperatives were governmental instrumentalities

The Court claims support for its apparent view that Congress authorized (or somehow expected) state control over wholesale rates charged by rural cooperatives in the legislative history of the Rural Electrification Act.   In particular it points to statements that cooperatives were to comply with state regulation of retail rates, a power which the States possessed in the absence of congressional authorization.   The Court then opines that there is no more reason to control retail rates than there is to control wholesale rates.   From these two premises it infers that Congress in effect authorized, or at the very least expected, state regulation that this Court had barred States from engaging in.   The two premises, however, do not support the conclusion.   Congress did not expressly authorize state regulation of wholesale rates charged by cooperatives, and I find nothing in the history of the Rural Electrification Act to indicate that Congress was in any way departing from its basic decision to embrace the holding in *Attleboro* that the Commerce Clause barred the States from regulating wholesale rates.

The second source for its apparent view that the Rural Electrification Act allows state regulation of wholesale rates is a statement appearing in a Rural Electrification Bulletin. The statement basically instructs the borrower to comply with the wholesale rate orders of any body that has jurisdiction to make such rate orders.   This statement is supposed to express a "policy of the REA [that] is wholly inconsistent with pre-emption of state regulatory jurisdiction" over wholesale rates.   *Ante*, at 387.   The Court's reliance on

exempt from FPC jurisdiction.   Hearings on H. R. 5348 et al. before the Subcommittee on Communications and Power of the House Committee on Interstate and Foreign Commerce, 90th Cong., 1st Sess., 3 (1967) (letter from Lee C. White, Chairman, FPC, to Hon. Harley O. Staggers); *id.*, at 5 (letter from Orville L. Freeman, Secretary of Agriculture, to Hon. Harley O. Staggers); *id.*, at 6 (letter from Warren Christopher, Deputy Attorney General, to Hon. Harley O. Staggers).   The bills were not reported out of committee.

this statement is misplaced. First, given the silence of the Rural Electrification Administration on this point, an isolated reference in an administrative bulletin is not persuasive evidence of the Administration's position. Second, in the absence of any persuasive evidence that Congress intended to depart from the *Attleboro* line in the case of cooperatives, I doubt seriously that the REA itself would purport to adopt a policy at odds with the law. And surely it did not do so in advising cooperatives to comply with the orders of any authority having jurisdiction. Nor am I persuaded that there was a general understanding at the state level that each of the States to which a generating cooperative delivered power at the wholesale level was free to regulate that cooperative's wholesale prices. Finally, the statement could have been intended to direct wholly intrastate cooperatives to comply with the orders of state commissions. In such a situation a State would have jurisdiction over wholesale rates and the Administration might well have concluded that it should honor state control over intrastate rates.[5]

Given the 48-year period in which Congress has asserted jurisdiction over wholesale rates and never manifested any belief that its policies would be furthered by state regulation of such rates, this Court should not purport to negate the congressional decision to abide by *Attleboro*. I would hold, as a matter of pre-emption, that absent a contrary indication from Congress States may not regulate wholesale rates of cooperatives.[6]

---

[5] It is surely more reasonable to read a statement that a borrower is to comply with rate orders of any body that has jurisdiction to mean only that borrowers should comply with regulations governing intrastate wholesale sales, over which a State could constitutionally exercise jurisdiction, rather than reading it to mean that borrowers are to comply with rate orders of commissions whose exercise of jurisdiction is clearly unconstitutional.

[6] I do not reach the question of whether the limitation on state power implicit in the Commerce Clause proscribes Arkansas' assertion of jurisdiction in this case.