**Eldon FUCHS, et al., Plaintiffs,**

v.

**RURAL ELECTRIC CONVENIENCE COOPERATIVE, INC., et al., Defendants.**

No. 86–3031.

United States District Court,
C.D. Illinois,
Springfield Division.

Oct. 30, 1987.

Thomas W. Kelty, John M. Myers, Pfeifer & Kelty, P.C., Springfield, Ill., for plaintiffs.

Vincent W. Moreth, William S. Hanley, Patrick V. Reilly, Springfield, Ill., Lee A. Freeman, Sr., Lee A. Freeman, Jr., Chicago, Ill., John P. Meyer, Danville, Ill., Hercules F. Bolos, James E. Weging, Sp. Asst. Attys. Gen., Chicago, Ill., Edward G. Pree, Springfield, Ill., Jones, Day, Beavis & Pogue, Dallas, Tex., for defendants; Thomas R. Jackson, Dallas, Tex., of counsel.

## OPINION ORDER

MILLS, District Judge:

Is the Illinois Electric Supplier Act unconstitutional?

Does the power service agreement thereunder violate the Sherman Antitrust Act?

No—to both inquiries.

This action is before the Court on Rural Electric Convenience Cooperative's motion for summary judgment and Central Illinois Public Service Company's motion to dismiss under Fed.R.Civ.P. 56 & 12(b)(6) respectively. The pertinent facts are not disputed, and these motions are consolidated for purposes of ruling.

## I

Central Illinois Public Service Company (CIPS) is a public utility regulated by the Illinois Commerce Commission (ICC). Rural Electric Convenience Cooperative (RECC) is an unregulated, not-for-profit corporation engaged in the retail distribution of electrical power to its members.[1] Plaintiffs are member-owners and customers of RECC.

In 1969, CIPS and RECC, pursuant to the Illinois Electric Supplier Act, Ill.Rev. Stat. ch. 111⅔, ¶ 406, entered into an agreement which divided up service areas. In compliance with the act, the ICC reviewed and approved the contract. RECC now exclusively services the area where Plaintiffs live at electric rates higher than those charged by CIPS.[2] Because of the contract, CIPS refuses to service RECC customers. Due to that refusal, Plaintiffs not only seek damages and an injunction against the retailers invalidating the contract under §§ 1 and 2 of the Sherman Act but also a declaration that the Electric Supplier Act is unconstitutional as violative of the Supremacy Clause.

## II

Undoubtedly, the horizontal market allocation in which the suppliers have engaged is a *per se* violation of applicable federal antitrust laws. *See Gainesville Utilities Dept. v. Florida Power & Light Co.*, 573 F.2d 292, 299 (5th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978). The ultimate issue then is whether the Sherman Act applies to the service area agreement between RECC and CIPS. Defendants assert that the agreement is immune from antitrust scrutiny under the state action doctrine enunciated by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).[3] Plaintiffs contend otherwise.

In *Parker*, a California raisin producer challenged the state's Agricultural Prorate Act under which a cartel of private raisin producers was created to stabilize prices and prevent economic waste. The Court, relying on principles of federalism and state sovereignty "refused to construe the Sherman Act as applying to the anti-competitive conduct of a State acting through its legislature. ... Rather, it ruled that the Sherman Act was intended to prohibit *private* restraints on trade, and it refused to infer an intent to 'nullify a state's control over its officers and agents' in activities directed by the legislature." *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38, 105 S.Ct. 1713, 1716, 85 L.Ed.2d 24

---

**1.** In 1936, Congress passed the Rural Electrification Act, 7 U.S.C. § 901–950, and authorized the Rural Electrification Administration to make loans to electrify rural America. Investor-owned utilities, however, did not take the initiative in extending electric service to most rural areas. As a result of the need for rural electrification in Illinois, RECC, among other cooperatives, was formed in 1936, obtained a $260,000 REA loan, and, in 1937, energized its initial 134 miles of distribution lines serving 395 member-owners. RECC now serves over 4,800 member-owners with 1,200 miles of distribution lines.

**2.** RECC is a member cooperative of Western Illinois Power Cooperative (WIPCO). WIPCO is a generation and transmission cooperative which has the responsibility for providing wholesale power to RECC and six other rural electric cooperative associations. In the late 1970s, WIPCO and Soyland Power Cooperative (a generation and transmission cooperative serving 15 rural electric cooperatives) negotiated with Illinois Power Company to participate in the ownership of the Clinton Nuclear Plant to assure a stable supply of power and energy to their members at reasonable rates. WIPCO now owns 9.5% of the Clinton plant and is thereby obligated to partially finance it. Since construction began on the plant, interest rates have risen sharply and the Three Mile Island disaster prompted new federal regulations which changed construction and engineering plans already in progress. These factors greatly increased the cost of completion, thereby raising WIPCO's financial obligation. The plant was originally scheduled for completion at a cost of $430 million; however, that figure has risen to at least $4.25 billion. Although WIPCO has put a cap of $450 million on the Clinton investment, its involvement in this project has caused rates to be higher than they otherwise would have been.

**3.** As we find review under *Parker* to be the proper course, analysis under *Rice v. Norman Williams Co.*, 458 U.S. 654, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982), is necessarily inapplicable. In *Rice*, the Court addressed the question of when a state law would be preempted by federal antitrust law.

(1985). Thus, the state action doctrine arose as an exception to antitrust law.[4]

In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410, 413, 98 S.Ct. 1123, 1135, 1136, 55 L.Ed.2d 364 (1978), a suit involving a municipally run electric utility system, the Court enunciated what has become known as the two-prong test of the state action doctrine. Thereafter, in *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Court applied the *Lafayette* test to a case where the state action exemption was claimed by a private party. In *Midcal*, the plaintiff challenged California's resale price maintenance and price posting statutes for the wholesale wine trade. The Court, quoting from *Lafayette*, stated that for the state action doctrine to apply, the challenged restraint (1) must be one clearly articulated and affirmatively expressed as state policy, and (2) must be actively supervised by the state. *Id.* at 105, 100 S.Ct. at 943.

In *LaSalle Nat'l Bank of Chicago v. DuPage County*, 777 F.2d 377 (7th Cir. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2892, 90 L.Ed.2d 979 (1986), the Seventh Circuit stated of the test's first prong: "[T]he state need not specifically authorize conduct with anti-competitive effects. ... It is sufficient that anti-competitive effects are a foreseeable consequence of engaging in the authorized activity." *Id.* at 381. Although *LaSalle* involved suit against a local government, its principles with respect to the first prong of the test are fully applicable here. *Cf. Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56, 105 S.Ct. 1721, 1726, 85 L.Ed.2d 36 (1984) (extending *Parker* rationale to suits against private parties).

### A. State Policy

In the instant case, the challenged restraint is the Illinois Electric Supplier Act. The legislature expressly declared its purpose as follows:

The General Assembly declares it to be in the public interest that, in order to avoid duplication of facilities and to minimize disputes between electric suppliers which may result in inconvenience and diminished efficiency in electrical service to the public, any 2 or more electric suppliers may contract, subject to the approval of the Illinois Commerce Commission, as to the respective areas in which each supplier is to provide service.

Ill.Rev.Stat. ch. 111⅔, ¶ 402 (1985). To further this intent, the legislature stated: "Any 2 or more electric suppliers may contract together defining and delineating, as between themselves, one or more service areas in which each such contracting supplier shall be entitled to furnish service. Such contracts are subject to the approval of the Commission." *Id.* ¶ 406.

The above sections sufficiently illustrate a "clearly articulated and affirmatively expressed" state policy to displace competition. But the legislature did not stop there. In ¶ 407 of the Act, the legislature prohibited, except under certain enumerated conditions, electric suppliers from making extensions of existing lines or constructing new lines for the purpose of serving new customers not yet covered by an area allocating agreement as set out in ¶ 406. Further, ¶ 408 provides for a hearing before the Illinois Commerce Commission between competing suppliers in which the Commission is to choose one, and only one, supplier to service a particular area.

One can hardly envision a statutory scheme which more clearly articulates and affirmatively expresses a state policy to displace competition. Electric utilities are generally acknowledged as a natural monopoly. *Affiliated Capital Corp. v. City of Houston*, 735 F.2d 1555, 1563 (5th Cir. 1984). What the Illinois legislature did in the Electric Supplier Act was to codify this notion. To require more of the General Assembly, this Court would have to hold that the "legislature must expressly state in a statute or its legislative history that it

---

**4.** "Although *Parker* involved an action against a state official, the Court's reasoning extends to suits against private parties." *Southern Motor* *Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56, 105 S.Ct. 1721, 1726, 85 L.Ed.2d 36 (1984).

intends for the delegated action to have anti-competitive effects. This contention embodies an unrealistic view of how legislatures work and of how statutes are written." *Town of Hallie,* 471 U.S. at 43, 105 S.Ct. at 1719.

Thus, the Court finds that the challenged restraint is a clearly articulated and affirmatively expressed state policy to displace competition and therefore satisfies the first prong of the *Lafayette–Midcal* test.

### B. Active Supervision

As mentioned, the second prong of the *Lafayette–Midcal* test for state action doctrine immunity requires the state's active supervision of the affirmatively expressed state policy. In certain situations, however, this prong need not be satisfied for the state action doctrine to apply. In *Town of Hallie,* four unincorporated townships brought suit against the City of Eau Claire contending that the city violated the Sherman Act by acquiring a monopoly over the provision of sewage treatment services and by tying the provision of such services to the provision of sewage collection and transportation services. The Supreme Court held that "the active state supervision requirement should not be imposed in cases in which the actor is a municipality." *Id.* 471 U.S. at 46, 105 S.Ct. at 1720. The Court so held for the following reasons:

[T]he requirement of active state supervision serves essentially an evidentiary function: it is one way of insuring that the actor is engaging in the challenged conduct pursuant to state policy. In *Midcal,* we stated that the active state supervision requirement was necessary to prevent a State from circumventing the Sherman Act's proscriptions "by casting ... a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." 445 U.S. at 106 [100 S.Ct. at 943]. Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy.

*Id.* at 46–47, 105 S.Ct. at 1720–1721.

Similarly, the instant case involves a not-for-profit utility owned by Plaintiffs. This is not a private, for-profit venture which is seeking to further its own interests. Like the situation involving a municipality, absolutely no danger of a private price-fixing agreement exists. The cooperative merely sets rates according to the cost of the energy plus debt service and operating expenses actually incurred. Further, through credits paid to a capital account, each patron is refunded amounts paid "in excess of operating costs and expenses." *Rural Electric Convenience Cooperative By-Laws,* art. VII, § 2.[5] Thus, lack of a profit motive coupled with the fact that the cooperative is owned by the very people challenging its unregulated existence, leads to the conclusion that the cooperative does not run afoul of the Sherman Act.

Judge Higginbotham, of the Fifth Circuit, has stated:

In our economic system, private business enterprises are presumed to respond predominantly, if not exclusively, to the profit motive. By contrast, the concept of "profit" *per se* is alien to the purposes of a unit of government. Consequently, the clash of interests necessitating an antitrust law—the private desire to reap extra-normal profits versus the public interest in free competition—will not appear in its traditional form when the accused antitrust conspirator is a governmental entity.

---

5. Plaintiffs' argument that the credits to the capital account are not paid back to the owner-members for many years after they are earned is of no moment since the decision to disburse such funds lies with the Board of Directors— which, of course, serves at the whim of the member-owners. Further, the member-owners are free to structure and amend their by-laws as they see fit.

*Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1571–72 (5th Cir.1984) (Higginbotham, J., concurring specially), *cert. denied,* 474 U.S. 1053, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986). The same argument could be made by simply substituting "not-for-profit electric utility" for "unit of government" and "governmental entity."

In support of this view, the Court of Appeals for the District of Columbia Circuit has stated that, although not-for-profit electric cooperatives enjoy a free hand in rate making,

> by their structural nature, the cooperatives are effectively self-regulating. They are completely owned and controlled by their consumer-members, and only consumers can become members. They are non-profit. Each member has a single vote in the affairs of the cooperative, and service is essentially limited to members. No officer receives a salary for his services and officers and directors are prohibited from engaging in any transactions with the cooperative from which they can earn any profit.

*Salt River Project Agricultural Improvement & Power Dist. v. Federal Power Comm'n,* 391 F.2d 470, 473 (D.C.Cir.1968) (footnote omitted), *cert. denied,* 393 U.S. 857, 89 S.Ct. 104, 21 L.Ed.2d 126 (1968).[6] This view fully supports the extension of the *Town of Hallie* rationale to cover electric cooperatives. Where there is no danger of private price fixing agreements (and thus no transgression of the Sherman Act), there is no need for active state supervision.

Further support is found in *Interface Group, Inc. v. Massachusetts Port Auth.,* 816 F.2d 9 (1st Cir.1987). There, the Massachusetts Port Authority (Massport) was created by the Massachusetts legislature to operate Logan Airport. In holding Massport immune from antitrust scrutiny, the First Circuit determined that Massport "resembles a municipal corporation." Therefore, it needed only to show that it acted pursuant to clearly articulated state policy and not that it was actively supervised by the state under the Supreme Court's decision in *Town of Hallie.* The Court based its decision, in part, on findings by the Supreme Judicial Court of Massachusetts that Massport was "in no sense a private or business corporation" and "[o]nly the public is to be benefited" by its existence. *Id.* at 13; *see also Interface Group, Inc. v. Massachusetts Port Auth.,* 631 F.Supp. 483 (D.Mass.1986) (quoting *Opinion of the Justices,* 334 Mass. 721, 734, 136 N.E.2d 223 (1956)).

The not-for-profit electric cooperative in the case at bar is likewise analogous to a municipality for antitrust purposes. As the Supreme Court stated in *Town of Hallie,* "there is little or no danger that it is involved in a *private* price fixing agreement." *Town of Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720. This statement would seem to have even more applicability where, as here, the consumers to be protected against such private agreements are the owners of the corporation involved. To say that state supervision is necessary in this situation is to say that the member-owners need the state to tell them not to make a private price fixing agreement against themselves. Such a holding would do violence to reason and common sense.

### III

Clearly, the impetus for Plaintiffs' suit against RECC is the relatively high electric

---

**6.** Plaintiffs point to *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 394, 103 S.Ct. 1905, 1917, 76 L.Ed.2d 1 (1983), wherein the Court stated that "there is evidence that even cooperative power utilities *may* engage in economically inefficient behavior." *Id.* at 394, 103 S.Ct. at 1918 (citing R. Schmalensee, The Control of Natural Monopolies (1979)) (emphasis added). A close reading of Schmalensee's work indicates that to say cooperatives *may* engage in inefficient economic behavior is tantamount to saying that the world *may* end tomorrow—yes, it could happen, but we do not have any empirical data on it yet. Schmalensee flatly states: "Experience with cooperative ownership structures in natural monopoly sectors is not extensive." *Id.* at 89. He further states: "Very little empirical work has been done on cooperatives. In particular, the politics and economies of rural electric and telephone cooperatives have been little studied...." *Id.* at 91. However, even granting the proposition that cooperatives *may* engage in economically inefficient behavior in no way suggests that they engage in private price fixing agreements.

rates its member-owners must pay. Just as clear, however, is the fact that these high rates are not the result of price fixing —the evil against which the Sherman Act protects. It is not the Court's nor the Sherman Act's concern if the cooperative's prices are relatively high. Keeping prices down is a problem to be solved by the member-owners as best they can at board meetings and the like or through the legislature, not in litigation.

Thus, the Court determines that, having passed the first prong of the *Lafayette–Midcal* test, RECC and CIPS are entitled to exemption from the federal antitrust laws under the state action doctrine.

Finding no transgression of the Sherman Act (and therefore none of the supremacy clause), the Court finds no merit in Plaintiffs' argument that the Electric Supplier Act is unconstitutional.

*Ergo,* for the reasons given above, Defendant Central Illinois Public Service Company's motion to dismiss is ALLOWED and Defendant Rural Electric Convenience Cooperative's motion for summary judgment is also ALLOWED. Consequently, Plaintiffs' motion to certify as a class is DENIED as moot.