ATTORNEYS FOR APPELLANT

John S. Bloom
Shambaugh Kast Beck & Williams, LLP
Fort Wayne, Indiana

Henry J. Price
Brad A. Catlin
Price Waicukauski Joven & Catlin, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Paul S. Kruse
    Parr Richey Obremskey
Frandsen & Patterson, LLP
Lebanon, Indiana

Jeremy L. Fetty
Travis W. Montgomery
Randolph G. Holt
    Parr Richey Obremskey
Frandsen & Patterson, LLP
Indianapolis, Indiana

John F. Kinney
    Parr Richey Obremskey
Frandsen & Patterson, LLP
Chicago, Illinois

FILED

Jun 15 2016, 8:23 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# COURT OF APPEALS OF INDIANA

Northeastern Rural Electric
Membership Corporation,

*Appellant/Cross-Appellee, Plaintiff,*

v.

Wabash Valley Power
Association, Inc.,

*Appellee/Cross-Appellant, Defendant.*

June 15, 2016

Court of Appeals Cause No.
49A02-1508-PL-1312

Appeal from the Marion Superior
Court

The Honorable Gary L. Miller,
Judge

Trial Court Cause No.
49D03-1201-PL-405

**Barnes, Judge.**

# Case Summary

Northeastern Rural Electric Membership Corporation ("Northeastern") appeals the trial court's grant of summary judgment to Wabash Valley Power Association ("Wabash"). We affirm.

# Issue

Northeastern raises two issues, which we consolidate and restate as whether the trial court properly granted summary judgment to Wabash on its statute of limitations defense.[1]

# Facts

Wabash is a generation and transmission cooperative that supplies wholesale electric power to its members. Wabash has more than two dozen members located in Indiana, Illinois, Michigan, and Ohio. Wabash's "primary mission" is "generating and transmitting electric energy" to its members. App. p. 264. A board of directors elected and controlled by the members governs Wabash and "establishes policies for the planning and operation of its business." *Id.* at 265. Each member has one director and one vote on the board. Northeastern is a "'local district corporation' as defined by Ind. Code 8-1-13-23(b), organized

---

[1] Wabash also argues on cross-appeal that the trial court erred by granting partial summary judgment to Northeastern regarding estoppel to deny that it breached the Contract. Because we affirm the trial court's grant of summary judgment to Wabash regarding the statute of limitations argument, we need not address Wabash's cross-appeal argument.

pursuant to Ind. Code 8-1-13, as an electric distribution cooperative." *Id.* at 1606. Northeastern is a member of Wabash.

[4] In 1977, Northeastern and Wabash entered into a Wholesale Power Supply Contract ("Contract") for Wabash to sell to Northeastern all electric power and energy that Northeastern required for the operation of its system until 2028. Throughout the years, the parties entered into supplements to the Contract. Under the Contract, rates were subject to the approval of the Public Service Commission of Indiana, which is now the Indiana Utility Regulatory Commission ("IURC").[2]

[5] In the late 1970's and early 1980's, Wabash borrowed money from the Rural Electric Administration ("REA") to invest in the Marble Hill nuclear power plant. The Marble Hill project was eventually discontinued in 1984, and Wabash's debt related to the project was approximately $460 million. Wabash sought to increase its rates to cover the debt, but the IURC denied its request. *See Nat'l Rural Utilities Co-op. Fin. Corp. v. Pub. Serv. Comm'n of Indiana*, 552 N.E.2d 23, 24 (Ind. 1990). Wabash filed a Chapter 11 bankruptcy petition in 1985. REA proposed a reorganization plan, which would have resulted in the IURC losing regulatory oversight of Wabash. The bankruptcy court rejected REA's proposed plan in part because it would have violated Wabash's supply contracts with its members, such as Northeastern. *See In re Wabash Valley Power*

---

[2] For simplicity, we will refer to both commissions as the IURC.

*Ass'n, Inc.*, No. 85-2238-RWV-111991, WL 11004220 (Bankr. S.D. Ind. 1991). REA appealed the decision to the Seventh Circuit Court of Appeals, which affirmed the district court's decision. *See Matter of Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305 (7th Cir. 1995), *cert. denied*.

[6]    Because of the debt to REA, which later became the Rural Utilities Service ("RUS"), Wabash was not considered a "public utility" under Section 201(e) of the Federal Power Act, 16 U.S.C. § 824e, and the Federal Energy Regulatory Commission ("FERC") did not have jurisdiction to regulate Wabash's rates until Wabash repaid the debt. In the late 1990's and early 2000's, Wabash began proposing to pay the debt and move from IURC regulation to FERC regulation.

[7]    In December 2003, Wabash filed a petition with the IURC seeking approval to repay most of its RUS debt, and the IURC approved the petition in February 2004. In April 2004, Wabash filed a supplemental petition seeking approval to pay off the balance of the RUS debt and submit to the exclusive jurisdiction of FERC. In June 2004, the IURC approved Wabash's petition. The IURC noted:

> The Commission is aware that the result of the full payment by Wabash Valley of its RUS debt will likely be that Wabash Valley may become subject to the exclusive jurisdiction of the FERC over its rates and charges for wholesale sales to Indiana members that heretofore have been subject to the jurisdiction of this Commission because of Wabash Valley's indebtedness to the RUS. The United States Court of Appeals found in *Salt River v. FPC*, 391 F.2d 470, 129 U.S. Appellate DC. 117 (1967) (petition

for rehearing denied) that despite the plain language of the Federal Power Act, rural electric cooperatives indebted to the REA (now the RUS) are not subject to FERC jurisdiction, the implication being that the FERC would have jurisdiction to regulate generation and transmission cooperatives not indebted to the RUS. Subsequently, the United States Supreme Court found in *Arkansas Electric Cooperative Corporation v. Arkansas Public Service Commission*, 461 U.S. 375, 103 S. Ct. 1905 (1983) that a state may regulate an electric generation and transmission cooperative such as Wabash Valley when the FERC has not exercised its federal power to do so. It thus appears that once the FERC asserts jurisdiction over Wabash Valley's rates and charges for wholesale sales to its members, this Commission may no longer retain that jurisdiction unless Wabash Valley again becomes indebted to the RUS.

App. p. 1588. Northeastern did not intervene in the IURC proceedings and did not challenge the IURC's orders. In April 2004, Wabash made its initial filings with FERC. In June 2004, FERC accepted the filing, and Wabash became subject to FERC rate regulation on July 1, 2004. *See Wabash Valley Power Ass'n, Inc.*, 107 FERC ¶ 61327 (June 29, 2004). Northeastern did not challenge the FERC filings.

[8] On July 1, 2005, Wabash and Northeastern entered into a Sixth Supplemental Agreement to its Contract. In the Sixth Supplemental Agreement, the parties entered into a buyout agreement that provided, in part, the Contract would "continue in full force and effect for a period of ten (10) years, to and including

June 30, 2015, at which time the [Contract] shall terminate" and Northeastern's membership in Wabash would end.[3] App. p. 1629.

[9] According to Northeastern, Wabash's rates under FERC regulation began to substantially increase in 2008 due to an increase in margins. In December 2010, Northeastern sent a demand letter to Wabash claiming that the change from IURC regulation to FERC regulation was a "material breach" of the Contract and demanding a return to IURC regulation or the ability to "rescind its obligations to continue purchasing power from [Wabash] based upon [Wabash's] repudiation and material breach of its contract obligations to [Northeastern]." *Id.* at 1592. In response, Wabash filed a petition with FERC seeking declaratory relief that the Northeastern rate schedule was subject to FERC regulation. Northeastern intervened in the action and requested that the petition be dismissed. FERC granted Wabash's petition in November 2011, finding that Northeastern's rate schedule was subject to FERC approval. *See Wabash Valley Power Ass'n, Inc.*, 137 FERC ¶ 61148 (Nov. 21, 2011).

[10] On January 5, 2012, Northeastern filed a complaint for declaratory judgment against Wabash. Northeastern alleged that Wabash's submission to FERC jurisdiction "was a clear repudiation of its specific contractual obligations . . . ." App. p. 42. According to Northeastern, as a result of Wabash's "material breach of contract," Northeastern suffered damages, including the payment of

---

[3] Effective July 1, 2015, Northeastern began purchasing its electrical power requirements from a different supplier.

higher rates for the purchase of electric energy and the denial of the ability to challenge rate petitions before the IURC. *Id.* Northeastern sought a judgment "declaring a material breach" of the Contract and declaring that Northeastern had "no duty to continue to purchase its wholesale electric power requirements" from Wabash because of the alleged breach. *Id.* at 43.

[11] In February 2012, Wabash removed the case to the United States District Court for the Southern District of Indiana. Northeastern moved to remand the matter back to state court, and Wabash moved for a preliminary injunction. The District Court denied Northeastern's motion and granted Wabash's motion. Northeastern appealed, and the Seventh Circuit reversed, holding that Northeastern had pled a state law breach of contract claim that did not arise under federal law. *See Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 897 (7th Cir. 2013), *as amended* (Apr. 29, 2013). Consequently, the district court remanded the case to the Marion Superior Court in June 2013.

[12] In November 2013, Northeastern moved for partial summary judgment, arguing that Wabash was estopped from denying that it breached the Contract with Northeastern when it changed rate regulators. In October 2014, the trial court granted Northeastern's motion, and also granted a motion by Wabash to certify the order for interlocutory appeal. However, this court denied Wabash's motion to accept its interlocutory appeal.

[13]   Wabash also filed a motion for summary judgment, arguing that Northeastern's claim is barred by the applicable statute of limitations. Northeastern responded and argued that Wabash was barred from raising the statute of limitations defense based on equitable estoppel and fraudulent concealment. Northeastern also argued that it did not suffer "ascertainable damage" until 2008 when Wabash increased its margins. App. p. 1774. After a hearing, the trial court granted Wabash's motion for summary judgment. The trial court found that the parties "agreed that the four-year statute of limitations under Indiana Uniform Commercial Code (IC § 26-1-2-725) applies." *Id.* at 12; *see also id.* at 31. The trial court then considered "when did [Northeastern's] breach of contract claim accrue and, assuming the [Northeastern] Complaint is untimely . . . whether there is any legal or factual basis to extend the limitations period." *Id.* The trial court found that Wabash had made a prima facie showing that Northeastern's claim for breach of contract accrued no later than July 1, 2004, and that it was filed more than three years after the applicable four-year statute of limitations expired. The trial court held that the damage from the breach was "the loss of the benefits of IURC rate regulation," which was lost no later than July 1, 2004, when the switch to FERC regulation was made. *Id.* at 33. Noting that Northeastern "made an informed and calculated business decision to do nothing to challenge that regulatory shift when it took place in 2004," the trial court found no legal or factual basis for extending the limitations period. *Id.* The trial court also noted that estoppel and fraudulent concealment must be specially and strictly pleaded and that Northeastern did not allege fraudulent concealment or equitable estoppel in its complaint. The trial court concluded

that Wabash was entitled to summary judgment based on the statute of limitations. Northeastern now appeals.

## Analysis

[14] Northeastern argues that the trial court erred by granting Wabash's motion for summary judgment. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56. We liberally construe all designated evidentiary material in a light most favorable to the non-moving party to determine whether there is a genuine issue of material fact. *Bradshaw v. Chandler*, 916 N.E.2d 163, 166 (Ind. 2009). The party that lost in the trial court has the burden of persuading the appellate court that the trial court erred. *Id.* Our review of a summary judgment motion is limited to those materials designated to the trial court. *Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 973 (Ind. 2001).

[15] Where a trial court enters findings of fact and conclusions thereon in granting a motion for summary judgment, as the trial court did in this case, the entry of specific findings and conclusions does not alter the nature of our review. *Rice v. Strunk*, 670 N.E.2d 1280, 1283 (Ind. 1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions thereon. *Id.* They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.*

[16] In Wabash's motion for summary judgment, it argued that Northeastern's claim was barred by the statute of limitations. The parties agree that a four-year statute of limitations is applicable here pursuant to Indiana Code Section 26-1-2-725, which provides: "An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued." Ind. Code § 26-1-2-725(1). However, the "section does not alter the law on tolling of the statute of limitations . . . ." I.C. § 26-1-2-725(4). "When a cause of action accrues is generally a question of law for the courts to determine." *Strauser v. Westfield Ins. Co.*, 827 N.E.2d 1181, 1185 (Ind. Ct. App. 2005).

[17] Northeastern argues that the breach occurred in 2008 when Wabash raised its rates rather than on July 1, 2004, when Wabash switched from IURC regulation to FERC regulation. According to Northeastern, a "material breach" did not occur until 2008 when Wabash "substantially deviated" from the manner of calculating rates approved by the IURC. Appellant's Br. p. 22. Northeastern contends that, despite the 2004 switch to FERC regulation, its action did not accrue until it suffered "some demonstrated harm," which occurred in 2008. *Id.*

[18] Wabash contends that Northeastern has repeatedly argued in related litigation that the breach here was the 2004 switch from IURC regulation. According to Wabash, Northeastern should be judicially-estopped from asserting an inconsistent position now. Judicial estoppel is a judicially created doctrine that seeks to prevent a litigant from asserting a position that is inconsistent with one asserted in the same or a previous proceeding. *Hall v. Dallman Contractors, LLC*,

994 N.E.2d 1220, 1225 (Ind. Ct. App. 2013). "Judicial estoppel is not intended to eliminate all inconsistencies; rather, it is designed to prevent litigants from playing 'fast and loose' with the courts. The primary purpose of judicial estoppel is not to protect litigants but to protect the integrity of the judiciary." *Id.* (quoting *Morgan County Hosp. v. Upham*, 884 N.E.2d 275, 280 (Ind. Ct. App. 2008), *trans. denied*). "The basic principle of judicial estoppel is that, absent a good explanation, a party should not be permitted to gain an advantage by litigating on one theory and then pursue an incompatible theory in subsequent litigation." *Id.* "Judicial estoppel only applies to intentional misrepresentation, so the dispositive issue supporting the application of judicial estoppel is the bad-faith intent of the litigant subject to estoppel." *Id.* at 1226.

[19]  Northeastern alleged in its complaint in this action that Wabash's submission to FERC jurisdiction "was a clear repudiation of its specific contractual obligations . . . ." App. p. 42. In its answer to Wabash's counterclaims, Northeastern asserted that the 2004 rate schedule filed with FERC "was a material breach" of the Contract. *Id.* at 1642. In a hearing before the federal district court, Northeastern argued that the breach was the switch to FERC regulation but that the breach did not become material until 2008. *Id.* at 1707-08.

[20]  It seems clear that Northeastern has previously argued that the breach occurred in 2004. However, Northeastern has also argued that the breach was not material until 2008. Even if we conclude that Northeastern is not judicially

estopped from asserting this argument, we conclude that its claim accrued in 2004.

[21] Our court has held that "a cause of action for breach of contract accrues at the time the breach occurs, and the statute of limitations begins to run from that date." *Meisenhelder v. Zipp Exp., Inc.*, 788 N.E.2d 924, 928 (Ind. Ct. App. 2003); *Pennsylvania Co. v. Good*, 56 Ind. App. 562, 103 N.E. 672, 673 (1913) ("The cause of action for a breach of a contract accrues at the time the breach occurs, and the statute of limitation begins to run from that date."); *see also* 51 AM.JUR.2D *Limitation of Actions* § 139 ("A cause of action for breach of contract accrues and the limitations period commences at the time of the breach, rather than at the time that actual damages are sustained as a consequence of the breach, regardless of the aggrieved party's lack of knowledge of the breach."). This is consistent with the statute governing the four-year statute of limitations applicable here. The statute provides: "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." I.C. § 26-1-2-725(2).

[22] The term of the Contract at issue here is the requirement that Wabash's rates were subject to the approval of the IURC. Wabash switched from IURC regulation to FERC regulation on July 1, 2004. The designated evidence demonstrates that Northeastern was well aware of the change in 2004. In fact, Northeastern had a representative on Wabash's board of directors. It was this switch in regulatory authority, not the later increase in rates, that allegedly breached the Contract. At that time, Northeastern could have filed its

declaratory judgment action. *See* I.C. § 34-14-1-3 ("A contract may be construed either before or after there has been a breach of the contract."). Consequently, we conclude that Northeastern's breach of contract claim accrued in 2004.

[23]     Northeastern also argues that, even if the claim accrued in 2004, Wabash is barred from raising a statute of limitations defense based on equitable estoppel and fraudulent concealment. The doctrine of equitable estoppel is an "extraordinary remedy" that "will apply to prevent a party from asserting a statute of limitations defense when 'such party by fraud or other misconduct has prevented a party from commencing his action or induced him to delay the bringing of his action beyond the time allowed by law.'" *Davis v. Shelter Ins. Companies*, 957 N.E.2d 995, 998 (Ind. Ct. App. 2011) (quoting *Martin v. Levinson*, 409 N.E.2d 1239, 1243 (Ind. Ct. App. 1980)), *trans. denied*.

[24]     Equitable estoppel is available if one party, through its representations or course of conduct, knowingly misleads or induces another party to believe and act upon his conduct in good faith and without knowledge of the facts. *Wabash Grain, Inc. v. Smith*, 700 N.E.2d 234, 237 (Ind. Ct. App. 1998), *trans. denied*. "The party claiming equitable estoppel must show its '(1) lack of knowledge and of the means of knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially.'" *Schoettmer v. Wright*, 992 N.E.2d 702, 709 (Ind. 2013) (quoting *Story Bed & Breakfast LLP v. Brown Cnty. Area Plan Comm'n*, 819 N.E.2d 55, 67 (Ind. 2004)).

[25]    Similarly, fraudulent concealment is an equitable doctrine that operates to prevent a defendant from asserting the statute of limitations as a bar to a claim where the defendant, by his own actions, prevents the plaintiff from obtaining the knowledge necessary to pursue a claim. *Meisenhelder*, 788 N.E.2d at 931 (citing *Doe v. Shults-Lewis Child and Family Servs., Inc.*, 718 N.E.2d 738, 744-45 (Ind. 1999)). When this occurs, equity will toll the statute of limitations until the equitable grounds cease to operate as a reason for delay. *Id.*

[26]    Northeastern claims Wabash promised its members that, when it switched to FERC regulation, the initial rate would be the same as the rate that had been approved by the IURC and that it "would continue to follow the agreement with reference to collection of margins." Appellant's Br. pp. 18-19. According to Northeastern, Wabash deviated from this promise in 2008 when it increased its margins beyond $5 million and the rates were "substantially inconsistent with the method to calculate rates that was approved by the IURC." *Id.* at 24. Northeastern contends that Wabash made a calculated decision to wait until the expiration of the four-year statute of limitations before increasing the rates.

[27]    In support of its argument, Northeastern relies on 2004 testimony filed before the IURC by Rick Coons, chief operating officer of Wabash, who testified:

> Regulation of rates by the FERC for Generation and
> Transmission cooperatives is very similar to rate regulation by
> the IURC. The rates will be cost-based and will be developed
> from Wabash Valley's cost of service. An annual reconciliation
> of actual costs to projected costs will also be performed. Our

initial rate filing will put in effect the rates recently approved by the IURC.

App. p. 1564. Additionally, in its initial FERC filing, Wabash stated:

> This formulary rate . . . maintains the same fundamental rate design as that most recently approved by the [IURC], while providing for a formulaic determination of the actual charges. Applying the formulary rates to the same test year costs and revenue requirements utilized in that Indiana proceeding will produce virtually the same rate changes as were approved by the IURC.

*Id.* at 2036. In the same FERC filing, Wabash stated:

> The IURC recently approved a settlement entered into between Wabash and the Indiana Office of the Utility Consumer Counselor (OUCC) that produces new wholesale rates to Wabash Valley's Indiana and Illinois Member cooperatives. . . . Wabash Valley has chosen to use these recently approved rate design and cost data as the basis for Wabash Valley's initial FERC formula rates to be applicable to all of its twenty-seven members.

> * * * * *

> As mentioned above, the Wabash Valley formulary rates are designed to provide the same rate design options for the Member cooperatives as those wholesale rates recently approved by the IURC and will, [sic] use the same test year costs and revenue requirements included in the Indiana proceeding, producing virtually the same rate charges that are included in each of the IURC approved rates.

The text of the Wabash Valley Comprehensive Cost of Service Formula was designed to track as closely as possible the development of the annual revenue requirements and rate design calculations in the wholesale rates recently approved by the IURC.

*Id.* at 2037-39.

[28] In response, Wabash argues that the equitable estoppel and fraudulent concealment arguments fail because Northeastern "made the informed choice to do nothing about the alleged breach because, based on its own investigation, Northeastern concluded that trying to change power suppliers made no economic sense because Wabash Valley's rates were lower than market prices for wholesale power." Appellee's Br. p. 40. Wabash argues that Northeastern designated no evidence that Wabash misled Northeastern or affirmatively concealed material information.

[29] Wabash notes that, in a March 2004 memo, Wabash informed Northeastern and its other members that:

Rates will be updated annually based on budgeted information and will be designed to achieve a $5 million net margin. It is important to note that under FERC regulation margins from non-member sales will be viewed as contributing to the $5 million net margin. The Board has discretion to raise or lower this margin target as business needs change.

App. p. 1855. Additionally, Wabash's initial filing with FERC noted that the margin requirement and the equity contribution of the rate *could* be increased by making "a Section 205 filing with this Commission." *Id.* at 1940.

[30] The designated evidence demonstrates that Wabash only promised that the initial FERC filing would be consistent with the rates approved by the IURC and designed to achieve a $5 million net margin. Wabash did not promise that the target margin would *never* change. In fact, Wabash specifically stated that the margin could change in the future. There is no designated evidence that Wabash knowingly misled or induced Northeastern regarding future rates or concealed from Northeastern the fact that the contract had been breached or prevented Northeastern from obtaining the knowledge necessary to pursue a claim. The doctrines of equitable estoppel and fraudulent concealment are not applicable here.

[31] Having concluded that Northeastern's breach of contract claim accrued in 2004 and that the doctrines of equitable estoppel and fraudulent concealment are inapplicable, we conclude that Northeastern's 2012 complaint was filed long after the four-year statute of limitations expired. Consequently, the trial court properly granted Wabash's motion for summary judgment.

## Conclusion

[32] The trial court properly granted Wabash's motion for summary judgment regarding the statute of limitations. We affirm.

[33] Affirmed.

Vaidik, C.J., and Mathias, J., concur.