## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 19 2016, 5:37 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Chad L. Rayle
Thompson Smith
Auburn, Indiana

ATTORNEYS FOR APPELLEE

Douglas E. Johnston
Angelica N. Fuelling
Tourkow, Crell, Rosenblatt &
Johnston, LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Gladys Hale and Oma Bolen,

*Appellants-Defendants,*

v.

Ricky Handshoe, Gary Handshoe, and Bertha Jimeniz,

*Appellees-Plaintiffs.*

October 19, 2016

Court of Appeals Case No.
57A05-1510-PL-1655

Appeal from the Noble Circuit Court

The Honorable G. David Laur, Judge

Trial Court Cause No.
57C01-1406-PL-15

**Pyle, Judge.**

# Statement of the Case

[1] This appeal involves a family dispute regarding the disbursement of inheritance money upon the death of the parties' mother/grandmother. Specifically, this dispute involves two sisters who claimed that they had never agreed to disburse a portion of the proceeds of two certificates of deposit ("CDs"), which are at issue in this appeal, to their nephews and niece. Gladys Hale ("Gladys") and Oma Bolen ("Oma"), who are sisters, appeal the trial court's order regarding the distribution of the disputed CDs, which had been issued in the names of their mother and brother and would have passed to their brother had he not predeceased their mother. The trial court determined that Gladys and Oma, following the death of their mother, had entered into a legally-binding agreement to distribute their respective portion of the disputed CDs to their two nephews, Ricky Handshoe ("Ricky"), Gary Handshoe ("Gary"), and their niece, Bertha Jimeniz ("Bertha"), who were the children of their deceased brother.

[2] Gladys and Oma argue that: (1) the trial court's finding that the parties had entered into a contract was not supported by the evidence; and (2) the breach of contract action brought by their nephews and niece was barred by the statute of limitations. Declining to reweigh the trial court's witness credibility determination and concluding that the action was not barred by the statute of limitations, we affirm the trial court's judgment.

[3] We affirm.

## Issues

1. Whether the trial court erred by finding that Gladys and Oma had entered into a legally binding agreement regarding the disputed CDs.

2. Whether the trial court erred by ruling that this breach of contract action was not barred by the applicable statute of limitations.

## Facts

This appeal stems from the estate planning of Annie Handshoe ("Annie"). Annie had six children, including Gladys, Oma, Mary Stanfield ("Mary), Glen Handshoe ("Glen"), Thee Handshoe ("Thee"), and James Handshoe ("James"). Annie lived in Kentucky, and her children lived in either Kentucky or Indiana.

In April 2005, Annie executed her will, directing that her estate was to be divided into "six equal shares[.]" (Plaintiffs' Ex. 2). Annie bequeathed her five then-living children a 1/6 share of her estate, and because her son James had died in 1972, she specifically bequeathed James' 1/6 share to his two children, Randy Handshoe ("Randy") and Patty Handshoe ("Patty"). Annie's will did not contain any specific directive or provision for how to proceed if one of her living children were to predecease her.

In addition to her will, Annie did some estate planning through purchasing life insurance and the funding of multiple CDs, which she obtained from the Bank of Hindman in Hindman, Kentucky. For the life insurance, she named her five then-living children and Randy and Patty as joint beneficiaries. As for the CDs, Annie obtained joint CDs in her name with each of her five then-living

children, and in the case of James, with her grandchildren, Randy and Patty. Specifically, she obtained joint CDs so that each child (including Randy and Patty for James) would receive a total of $200,000.[1] In relevant part, Annie deposited $100,000 into CD number 22348 ("CD 48") and deposited $100,000 into CD number 22352 ("CD 52") (collectively, "Thee's CDs"), and she listed herself and her son, Thee, as account holders.[2] Additionally, Annie obtained two CDs that were made payable on death to all of her children and to Randy and Patty for James. Specifically, CD number 26742 ("CD 42"), which had a value of $513,327.35, and CD number 26744 ("CD 44") (collectively, "the undisputed CDs"), which had a value of $70,811.51, were made out as follows:

> Annie Handshoe Payable on Death to 1/6 share to Thee Handshoe and Gladys Hale and Oma Bolen and Mary Stanfield and Glen Handshoe and 1/12 share to Randy Handshoe and Patricia Handshoe . . . .

(Plaintiffs' Ex. 4).

[7] On January 30, 2006, in a Kentucky court, a temporary guardianship was established over Annie, and Mary was named as the guardian. The guardianship, which remained in effect until Annie's death, was entered

---

[1] For most of the children, Annie obtained two separate CDs with values of $100,000 each.

[2] Annie titled CD 48 in the names of "Annie Handshoe or Thee Handshoe WROS" or with right of survivorship, and she titled CD 52 as "Annie Handshoe as trustee for Thee Handshoe." (Plaintiffs' Ex. 5).

because Annie was "suffer[ing] from Alzheimers, dementia[,] and confusion." (Plaintiffs' Ex. 3).

[8] Four months later, in April 2006, Thee died. After Thee's death, Mary realized that Thee's CDs would revert to Annie and eventually to her estate. Therefore, she discussed Thee's CDs with Gladys, Oma, and Glen, and they "verbally . . . all agreed" that they would give "Thee's part" to his children, Ricky, Gary, and Bertha (collectively, "Thee's children"). (Tr. 61).

[9] Shortly thereafter, on February 2, 2007, Annie died in Kentucky, and her estate was opened in a Kentucky probate court. Gladys, whom Annie had nominated as her executrix in her will, was appointed as executrix.

[10] After Annie's death, some of the family told Gary that he should get a written agreement drafted for the distribution of what would have been Thee's share of Annie's estate. Gary and Ricky, who lived in Indiana, then went to an Indiana attorney, who drafted a "Family Settlement Agreement" ("FSA").[3] The FSA provided, in relevant part:

> The undersigned believe it is clear from reading the Last Will and Testament of ANNIE HANDSHOE and otherwise knowing her wishes, that it was her intent that any share of her estate, any portion of life insurance proceeds or any bank account was to go to each of her six children or if any child would predecease her, to that deceased child's children (her grandchildren). Therefore,

---

[3] In its order, the trial court referred to the FSA as the "Atz Agreement" because it was prepared by attorney Doug Atz. (App. 13).

as a result of THE[E] HANDSHOE predeceasing ANNIE HANDSHOE, it is agreed that the share to which THE[E] HANDSHOE would have been entitled if he had survived should be distributed to his children whether such distribution is from her estate under her Last Will and Testament or under life insurance or any bank account to which [] THE[E] HANDSHOE's name had been attached.

Therefore, the undersigned named beneficiaries of ANNIE HANDSHOE do hereby agree that the estate of ANNIE HANDSHOE, the proceeds of ANNIE HANDSHOE's life insurance and any bank account to which THE[E] HANDSHOE's name had been added, shall be shared and distributed as though THE[E] HANDSHOE had survived ANNIE HANDSHOE, and instead that THE[E] HANDSHOE's share be distributed to the children of THE[E] HANDSHOE. The children of THE[E] HANDSHOE are GARY HANDSHOE, BERTHA JIMENIZ[,] and RICKY HANDSHOE.

(Plaintiffs' Ex. 8). Gary picked up the FSA from the attorney on February 15, 2007, and then passed it around to the family members who lived in Indiana, which included Gladys, Oma, Randy, Patty, Gary, Ricky, and Bertha. Each party signed his/her name and had it notarized. Gary and Ricky then took the signed FSA to Kentucky where Mary and Glen lived. Mary signed the FSA and had it notarized, but Glen refused to sign it. Thereafter, Gary took the FSA back to Indiana and gave it to Gladys "because she was going to take care of everything for" Thee's children. (Tr. 42). Gary did not make a copy of the FSA.

[11] In early March 2007, Glen objected to Gladys' appointment as executrix of Annie's estate, and the Kentucky probate court set aside the order of

appointment. The Kentucky probate court then appointed Michael Vance ("Administrator Vance") as the public administrator of Annie's estate.

[12] In March 2007, the attorney for the Bank of Hindman prepared a document for Annie's heirs to sign regarding how the bank would distribute the proceeds of CDs 42 and 44, the undisputed CDs. Specifically, this document provided:

> To the Bank of Hindman:
>
> In the case of [CDs 42 and 44,] we agree that the 1/6 interest designated to Thee Handshoe (deceased) be paid to the Estate of Thee Handshoe and NOT divided among the remaining pay on death beneficiaries.

(Plaintiffs' Ex. 10). All beneficiaries, except Glen, signed this document. Shortly thereafter, Annie's life insurance proceeds were distributed, and the parties arranged for Thee's children to receive what would have been Thee's beneficiary share.

[13] In Fall 2007, Administrator Vance filed, with the Kentucky probate court, a request to allow the Bank of Hindman to release the funds of Annie's CDs. The Kentucky probate court ultimately ordered that Thee's CDs were to be paid to Annie's estate because Thee had predeceased Annie. It also ordered that the undisputed CDs were to be distributed to the beneficiaries as listed on those

CDs and that Thee's 1/6 share of the undisputed CDs would be divided among those surviving payees.[4]

[14] Thereafter, the Bank of Hindman distributed the proceeds from the undisputed CDs. Gladys, Oma, Randy, and Patty then paid Thee's share of these funds to Thee's Children.[5] Glen, however, did not pay anything to Thee's Children. Additionally, the Bank of Hindman deposited Thee's CDs into Annie's estate. At that time, Thee's CD's were worth $211,225.00 (or $105,612.50 in each CD 48 and 52).

[15] In June 2009, while Annie's estate remained pending, Gladys gave Gary a copy of a letter that she had submitted to Annie's estate. In this letter, Gladys acknowledged that, after Annie's death, everyone except Glen had "signed and notarized that [they] wanted no part of Thee Handshoe['s] money." (Plaintiffs' Ex. 13). Gladys asserted that she had given Administrator Vance a "signed and notarized paper" showing that "Oma, Mary, Patty, Randy[,] and Gladys . . . gave everything Thee had to his Childrens [sic]." (Plaintiffs' Ex. 13). The letter also provided that "Thee Handshoe's money should have never went [sic] into

---

[4] Initially, on September 21, 2007, the Kentucky probate court entered an order directing the bank to pay Annie's CDs according to the specific terms of the various CD accounts. Specifically, the probate court ordered that the funds in Thee's CDs would be paid to Thee's estate and that Thee's 1/6 share of the undisputed CDs would be paid to Thee. However, on October 5, 2007, after the Bank of Hindman intervened in Annie's estate case and sought clarification of the probate court's order, the Kentucky probate court entered an order to correct its previous order, which resulted in the above-described distribution.

[5] When Gladys wrote her checks to Thee's children, she wrote "Gift" on the memo line. (Defendants' Exs. D & E).

the estate because Annie's childrens [sic] gave it to Thee['s] childrens [sic] so that became their money not the estate." (Plaintiffs' Ex. 13).

[16] At some point after May 2010, Administrator Vance was removed as public administrator because of misconduct, including removing funds from Annie's estate. He repaid the funds to the estate, and the Kentucky probate court appointed Robin Smith ("Executor Smith") as executor.

[17] In September 2011, Executor Smith made a partial distribution from Annie's estate to the heirs. Mary and Patty paid their respective part that they had received from Thee's CDs to Thee's children. Gladys, Oma, and Randy did not pay anything to Thee's children. Around this time, Gladys contacted Patty and told her that she could keep the money she had received from Thee's CDs because these funds went into Annie's estate.

[18] Thereafter, in 2013, Executor Smith made the final distribution from Annie's estate. Again, Mary and Patty paid the respective part that they had received from Thee's CDs to Thee's children while Gladys, Oma, and Randy did not pay anything to Thee's children.

[19] On June 13, 2014, Thee's children, Ricky, Gary, and Bertha, filed a complaint in Indiana in the Noble Circuit Court against Gladys, Oma, and Randy for breach of contract. Thee's children alleged that these defendants had failed to comply with the FSA when they "refused to pay over the funds received by them out of [Thee's] CDs." (App. 23). Because Thee's children did not have a signed copy of the FSA, they attached an unsigned copy to their complaint.

[20] Thereafter, Gladys, Oma, and Randy, who were represented by the same attorney, filed an answer. They asserted affirmative defenses, including a denial that they had signed the FSA and an assertion that any agreement was not enforceable because it was barred by the applicable statute of limitations. Additionally, they asserted that the Kentucky probate court had already determined that Thee's CDs went to them and not to Thee's children.

[21] On August 26, 2015, the trial court held a bench trial. During the trial, Gary testified that Gladys, Oma, and Randy had signed the FSA and had it notarized. Mary and Patty also testified that they had seen the fully executed FSA, which contained the notarized signatures of Gladys, Oma, and Randy. After Thee's children rested their case, the attorney for Gladys, Oma, and Randy moved for a directed verdict, arguing that Thee's children action was barred by the six-year statute of limitations for a contract claim. They reasoned that Thee's children were required to file their action within six years of February 2007 when agreement was alleged to have been signed. Thee's children argued that the time period for the statute of limitations ran from the date of the breach of the contract in September 2011, not from the date the agreement was signed. The trial court overruled the directed verdict motion.

[22] During their case-in-chief, Gladys, Oma, and Randy's main defense was that they had not signed the FSA. They did not deny the existence of the FSA but testified that they had not signed it. They acknowledged that, after Annie's death, they had agreed that Thee's children should receive Thee's share. They also acknowledged that they had paid Thee's children Thee's share of the

undisputed CDs that they had received. They also testified that Thee's children received Thee's beneficiary portion of the life insurance proceeds. Gladys testified that the funds from Thee's CDs, once they went into Annie's estate, belonged to her and not to Thee's children. She also testified that Thee's children "should be down on their hands and knees thanking the good lord above that [she had] decided to give them" money from the undisputed CDs. (Tr. 179).

[23] At the end of the trial, the trial court commented on the conflicting testimony that had been presented and how it would have to weigh the credibility of the witnesses:

> I look at documents. I look at, I listen to testimony and I've got two absolutely different versions of, of events. Especially that, that revolve around these two CDs that we're talking about . . . I mean sometimes I can . . . reconcile the testimony in a fashion that, the people, uh, I can determine that everybody is, is, uh, being truthful, but a little mistaken . . . I mean when, when I have a number of people tell me, I saw the document, I saw the signatures. Then I have another smaller group tell me, uh, I didn't sign and, or maybe I never even saw it. Uh, I've got to decide in the end who do I believe. And that is not an easy thing for me to do guys. I mean, I, but, but I do that, I mean that's my job.

(Tr. 232-33).

[24] Thereafter, on September 15, 2015, the trial court issued a detailed, thirteen-page order, which contained over 100 findings relating to the facts and history underlying this case. The trial court entered specific findings regarding witness

credibility, including its reasons why it weighed Mary's and Patty's testimony to be more credible than that of Gladys, Oma, and Randy. Ultimately, the trial court found that the parties had entered into "a legally binding agreement" and that the FSA was "enforceable under Indiana law." (App. 21). The trial court also concluded that Gladys, Oma, and Randy "ha[d] not fully performed their entire obligations under the agreement." (App. 21). The trial court entered judgment against Gladys, Oma, and Randy and in favor of Ricky, Gary, and Bertha. Specifically, the trial court entered judgment against Gladys and Oma for $35,204.16 plus interest and judgment against Randy for $17,602.08 plus interest. Thereafter, Randy paid his portion of the judgment. Gladys and Oma now appeal.

# Decision

[25] Gladys and Oma argue that: (1) the trial court's finding that the parties had entered into a legally binding agreement was not supported by the evidence; and (2) the breach of contract action was barred by the statute of limitations. We will address each argument in turn.

## 1. Finding of an Agreement

[26] We first address Gladys and Oma's challenge of the trial court's finding that the parties had entered into an agreement. Here, the trial court entered Trial Rule 52 findings and conclusions pursuant to a request from Thee's children.

> [P]ursuant to Trial Rule 52(A), we "shall not set aside the findings or judgment unless clearly erroneous, and due regard

shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Factual findings are only clearly erroneous where there is no support for them in the record, either directly or by inference; a judgment is only clearly erroneous when it applies an improper legal standard to proper facts. *Johnson v. Wysocki,* 990 N.E.2d 456, 460 (Ind. 2013). "In either case, we must be left 'with the firm conviction that a mistake has been made.'" *Id.* (quoting *Yanoff v. Muncy,* 688 N.E.2d 1259, 1262 (Ind. 1997)).

*Johnson v. Johnson*, 999 N.E.2d 56, 59 (Ind. 2013). Additionally, we will "'not reweigh the evidence" and, instead, will "'consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment.'" *State v. Int'l Bus. Machines Corp.*, 51 N.E.3d 150, 158 (Ind. 2016) (quoting *Yoon v. Yoon,* 711 N.E.2d 1265, 1268 (Ind. 1999)).

[27]     Gladys and Oma contend that the trial court erred by determining that the parties had entered into a binding agreement regarding Thee's CDs. They do not dispute that the FSA was drafted and existed. Instead, they assert that they never signed the FSA, and they point to the testimony of Gladys, Oma, and Randy, arguing that it shows that there was never a signed agreement. They acknowledge that the testimony of Mary, Patty, and Gary showed otherwise, but they suggest that their conflicting testimony should not have been weighed more favorably than the testimony of Gladys, Oma, and Randy. They also point to other trial evidence, arguing that it should be interpreted to support a finding that there was no agreement.

[28] The trial court, however, made specific findings relating to witness credibility and why it determined that the FSA was a legally binding agreement that had been signed by the defendants. In relevant part, the trial court found as follows:

> 115. There were only two witnesses who testified at trial that did not have an economic interest in the outcome. Certainly, all three Plaintiffs and all three Defendants will be affected by the court's ruling. Only Mary Stan[]field and Patty Handshoe-Hug have no economic interest.
>
> 116. In fact, Mary Stan[]field and Patty Handshoe-Hug are the only witnesses who fully performed under the obligations of the [FSA], namely paying money over to the Plaintiffs.
>
> 117. Lacking any economic interest to color or shade their testimony, the Court finds the testimony of Mary Stan[]field and Patty Handshoe-Hug as being the most credible.
>
> 118. The testimony of Mary Stan[]field and Patty Handshoe-Hug that they both, with their own eyes, saw the [FSA] fully signed and notarized by each of the Defendants, is the ultimate persuasive evidence in this trial. The fact that all of the Defendants admit that they partially performed consistent with the agreement only cements the court's finding that the testimony of Mary Stan[]field and Patty Handshoe-Hug is the best evidence. The Court's findings are not to be construed as anyone intentionally falsely testifying or committing perjury. Rather, the court recognizes that these documents at issue go back over eight years, and human memory can fail. However, on the whole, the credibility balance weighs in favor of Plaintiffs and against the Defendants.

(App. 20).

[29] The evidence most favorable to the trial court's judgment shows that the FSA was drafted to address the distribution of Thee's share of Annie's estate, life

insurance, and bank accounts and that it was signed by the appellants. Thereafter, consistent with the terms of the FSA, Gladys and Oma paid Thee's children Thee's share of the undisputed CDs and life insurance proceeds, which were not required to be included in Annie's estate. Under Kentucky law, however, Thee's CDs were required to be included in Annie's estate, and they were included in 2007. In 2009, Gladys wrote a letter, acknowledging that, after Annie's death, everyone except Glen had "signed and notarized that [they] wanted no part of Thee Handshoe['s] money." (Plaintiffs' Ex. 13). The letter also provided that "Thee Handshoe's money should have never went [sic] into the estate because Annie's childrens [sic] gave it to Thee['s] childrens [sic] so that became their money not the estate." (Plaintiffs' Ex. 13). However, once the distributions of funds were made from Annie's estate in 2011 and 2013, Gladys and Oma refused to pay Thee's children the funds from Thee's CDs.

[30] Gladys and Oma's argument is nothing more than a request to reweigh the trial court determination of witness credibility, which we cannot do. Accordingly, we affirm the trial court's judgment. *Hall v. Hall*, 27 N.E.3d 281, 286 (Ind. Ct. App. 2015) (declining the appellant's request reweigh evidence), *trans. denied*; *Walker v. Elkin*, 758 N.E.2d 972, 974-75 (Ind. Ct. App. 2001) (affirming the trial court's judgment in a contract action and refusing to reassess witness credibility

and to reweigh evidence where the appellant's arguments were "based solely on the evidence contrary to the trial court's judgment").[6]

## 2. Statute of Limitations

Lastly, we turn to Gladys and Oma's argument that Thee's children's breach of contract claim was barred by the six-year statute of limitations.

INDIANA CODE § 34-11-2-9 provides that "[a]n action upon promissory notes, bills of exchange, or other written contracts for the payment of money executed after August 31, 1982, must be commenced within six (6) years after the cause

---

[6] Gladys and Oma also make additional arguments that amount to nothing more than further requests to reweigh the evidence. They argue that there was not a valid contract or agreement because there was not a meeting of the minds. While one of the required elements for the formation of a contract is a meeting of the minds, *see Hall*, 27 N.E.3d at 286 ("A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract."), Gladys and Oma's defense at trial was not regarding the formation or specific terms of the agreement; instead, they argued about whether they had actually signed the existing agreement. Thus, such argument is waived. Waiver notwithstanding, the evidence most favorable to the trial court's judgment, including Gladys and Oma's conduct of partially performing under the FSA, supports a determination regarding intent and the trial court's finding that a legally binding agreement existed. *See id.* (explaining that when analyzing the meeting of the minds element, "[t]he intent of the parties to a contract is a factual matter to be determined from all the circumstances"); *Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005) (explaining "[t]he intent relevant in contract matters is not the parties' subjective intents but their outward manifestation of it").

Additionally, Gladys and Oma also suggest that the trial court's finding of the existence of an agreement is not supported by the evidence because Thee's children did not introduce into evidence the original or a copy of the fully signed and notarized FSA. In response, Thee's children point to Indiana Evidence Rule 1004, which provides, in relevant part, that "[a]n original is not required and other evidence of the content of a writing . . . is admissible if . . . all originals are lost or destroyed, and not by the proponent acting in bad faith . . . ." Here, Thee's children did not have the original or a copy of the signed, notarized FSA. During the bench trial, an unsigned copy of the FSA was entered into evidence without objection. Thee's children used the unsigned copy of the FSA as evidence of the terms of the agreement and testimony from Mary, Patty, and Gary to show that the parties at issue had signed the FSA. Gladys and Oma's argument challenging this evidence, to which they did not object, is without merit and amounts to a further request to reweigh the evidence.

of action accrues." "Our court has held that 'a cause of action for breach of contract accrues at the time the breach occurs, and the statute of limitations begins to run from that date.'" *Northeastern Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 56 N.E.3d 38, 44 (Ind. Ct. App. 2016) (quoting *Meisenhelder v. Zipp Exp., Inc.*, 788 N.E.2d 924, 928 (Ind. Ct. App. 2003)), *trans. denied*.

[33] Gladys and Oma contend that Thee's children's cause of action accrued, and the statute of limitations began to run, on October 30, 2007, which they assert was "the obvious date that the alleged [FSA] was breached." (Appellants' Br. 18). This date corresponds to when Gladys wrote checks to Thee's children for Thee's share of the undisputed CDs, and on these checks, Gladys wrote the word "Gift." (Defendants' Ex. E). They contend that because Gladys wrote the word "gift" instead of "agreement" on the checks and because the checks did not include an amount that included funds from Thee's CDs, then Thee's children knew or should have known that a breach occurred on that date. Gladys and Oma argue that, as a result, Thee's children should have filed their action by October 30, 2013 and that their action filed on June 13, 2014 was barred by the statute of limitations.

[34] We, however, conclude that Gladys and Oma have waived appellate review of this argument because they made a statute of limitation argument on directed verdict, presented evidence on their own behalf, and then did not renew their motion at the conclusion of their case. "We have held that when a defendant moves for a judgment on the evidence and then introduces evidence on his own

behalf after the motion is denied, the defendant has waived any alleged error regarding the denial of the motion." *Hartford Steam Boiler Inspection & Ins. Co. v. White*, 775 N.E.2d 1128, 1134 (Ind. Ct. App. 002), *reh'g denied*, *trans. denied*. *See also* Ind. Trial Rule 50(A)(6) ("A motion for judgment on the evidence made at one stage of the proceedings is not a waiver of the right of the court or of any party to make such motion . . . except that error of the court in denying the motion shall be deemed corrected by evidence thereafter offered or admitted."). Therefore, Gladys and Oma have waived appellate review of this argument that was raised in their motion for directed verdict.[7]

[35] Waiver notwithstanding, we agree with Thee's children argument that "[t]he FSA was breached on the date that the first Estate distributions made in 2011 were not paid over by Appellants to Appellees in accordance with the FSA." (Appellees' Br. 14). Here, the CDs at issue, Thee's CDs, were put into Annie's estate in November 2007, and the distributions of funds from the estate were not made until in 2011 and 2013. After Gladys and Oma received their respective distributions, they did not pay Thee's children the funds from Thee's CDs. Thee's children filed their complaint in July 2014, which was well within

---

[7] They also waived this argument because it is not the same argument raised at trial. When Gladys and Oma moved for directed verdict on their statute of limitations argument, they argued that Thee's children's action was barred by the statute of limitations because the action should have been filed within six years of February 2007 when the FSA was alleged to have been signed. On appeal, they now argue that the action should have been filed within six years of when the agreement was breached, which they contend was October 2007. A party may not present an argument on appeal that was not presented to the trial court. *See Sullivan Builders & Design, Inc. v. Home Lumber of New Haven, Inc.*, 834 N.E.2d 129, 134 (Ind. Ct. App. 2005) (explaining that "a party may not raise one ground for objection at trial and argue a different ground on appeal"), *reh'g denied*, *trans. denied*.

the applicable statute of limitations. Accordingly, Thee's children's action was not barred by the statute of limitations.[8]

[36] Affirmed.

Kirsch, J., and Riley, J., concur.

---

[8] Thee's children contend that Gladys and Oma have "wrongly assert[ed] that the discovery rule applies in this case." (Appellees' Br. 15). Both parties agree that Indiana has applied the discovery rule to contract cases. *See Meisenhelder*, 788 N.E.2d at 930 and *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 687-88 (Ind. Ct. App. 2006) (both applying discovery rule to breach of contract actions). *But see New Welton Homes v. Eckman*, 830 N.E.2d 32, 35 (Ind. 2005) (concluding that the discovery rule did not apply to toll a one-year contractual limitation provision), *reh'g denied*. However, we need not decide whether the discovery rule is applicable because we conclude that Thee's children's action was brought within six years of the actual breach of the agreement, which was the same time that they would have discovered the breach.